CHARTIER REAL ESTATE COMPANY, INC., PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket Nos. 838–66, 2116–67.    Filed May 29, 1969.

*Lester H. Salter* and *James R. McGowan,* for the petitioner.
*Joel Gerber,* for the respondent.

### OPINION

RAUM, *Judge:* The Commissioner determined deficiencies in petitioner's Federal income taxes in the following amounts:

| | Year ending | Amount |
|---|---|---|
| Docket No. 838–66 | June 30, 1962 | $270. 04 |
| Docket No. 2116–67 | June 30, 1965 | 6, 812. 22 |

In its petition in docket No. 838–66, petitioner seeks a refund of $2,948.96 in respect of an alleged overpayment. Certain matters previously in controversy are no longer in dispute, leaving for our determination the question of the proper relationship between a net operating loss carryback deduction and the "alternative" tax computation provided in section 1201(a), I.R.C. 1954. We must decide whether the carryback may be taken into account in determining the amount of that component of the tax that is to be computed under section 1201 (a)(2). If we decide that it may not be so taken into account, we

must decide whether any amount of the net operating loss remains to be carried forward to another taxable year under section 172(b)(2).

All the facts have been stipulated by the parties, and their stipulation together with attached exhibits is incorporated herein by this reference.

Petitioner is a Rhode Island corporation with its principal office in Newport, R.I. It filed its corporate Federal income tax returns for its taxable years ended June 30, 1962, and June 30, 1965, with the district director of internal revenue in Providence, R.I.

Petitioner was incorporated on June 26, 1947, and during the years in question engaged in the business of renting real estate. It also occasionally sold some of its rental properties during the years in question. Petitioner keeps its books and records and files its Federal income tax returns on the basis of a fiscal year ending June 30.

The table below sets forth petitioner's taxable income before any deduction for net operating losses (as agreed to by the parties) and petitioner's net operating losses:

| Year ending June 30— | Taxable income before net operating loss | Net operating loss |
|---|---|---|
| 1960 | $11, 396. 56 | |
| 1961 | | $13, 764. 98 |
| 1962 | 84, 903. 21 | |
| 1963 | | 17, 492. 02 |
| 1964 | | 5, 362. 75 |
| 1965 | 56, 137. 54 | |
| 1966 | | 5, 181. 18 |

The net operating loss for the year ending June 30, 1961, was carried back (and used in full) to the years ending June 30, 1958, and June 30, 1959. Of the net operating loss for the year ending June 30, 1963, $11,396.56 was carried back to the year ending June 30, 1960, leaving $6,095.46.

In its Federal income tax return for the year ending June 30, 1962, petitioner reported taxable income of $83,964.70, of which $83,787.64 represented long-term capital gain. In computing its tax liability, petitioner used both the "regular" and "alternative" methods of computation. The "regular" method is prescribed in section 11, I.R.C. 1954, and the "alternative" method is prescribed in section 1201(a). The "regular" method produced the following result:

| | |
|---|---|
| Normal tax: 30%×$83,964.70= | $25, 189. 41 |
| Surtax: 22%×$58,964.70 ($83,964.70—$25,000)= | 12, 972. 23 |
| Total | 38, 161. 64 |

The computation under the "alternative" method was as follows:

| | |
|---|---:|
| Taxable income | $83,964.70 |
| Less: Capital gain | 83,787.64 |
| | 177.06 |
| 30% of $177.06= | 53.12 |
| 25% of $83,787.64= | 20,946.91 |
| Total | 21,000.03 |

Since the "alternative" computation was more favorable, it was the one that petitioner used to determine its tax liability.

At some time before the close of petitioner's taxable year ending June 30, 1963, the parties agreed to an increase in petitioner's taxable income for the year ending June 30, 1962, in the amount of $938.51 and to the allowance of an investment credit of $270.04 unclaimed on the petitioner's return for that year. The two methods of computing tax liability now produced the following results (prior to allowance of any investment credit):

#### "REGULAR" METHOD

| | |
|---|---:|
| Normal tax: 30%×$84,903.21= | $25,470.96 |
| Surtax: 22%×$59,903.21 ($84,903.21—$25,000)= | 13,178.71 |
| Total | 38,649.67 |

#### "ALTERNATIVE" METHOD

| | |
|---|---:|
| Taxable income | $84,903.21 |
| Less: Capital gain | 83,787.64 |
| | 1,115.57 |
| 30% of $1,115.57= | 334.67 |
| 25% of $83,787.64= | 20,946.91 |
| Total | 21,281.58 |

On September 11, 1964, petitioner filed two claims for refund with the district director of internal revenue at Providence, R.I., with respect to its taxable year ending June 30, 1962. Petitioner's claim was that it should be allowed to apply its aggregate unused net operating losses of $11,458.21 ($5,362.75 from the year ending June 30, 1964, and the remaining $6,095.46 from the year ending June 30, 1963) not only against its ordinary income of $1,115.57 for the year ending June 30,

1962, but also against its long-term capital gain of $83,787.64 in computing the "alternative" tax.

On November 30, 1965, the Commissioner issued a notice of deficiency in petitioner's income tax for the year ending June 30, 1962. The notice of deficiency increased petitioner's taxable income by $938.51, as previously agreed to, but disallowed the investment credit. The petitioner now agrees that this disallowance was correct. The Commissioner took into account the net operating loss in determining petitioner's "taxable income" (it was reduced from $84,903.21 to $73,445.00), but he did not apply any part of the loss against petitioner's capital gain in computing the "alternative" tax. The tax computed by the "regular" method with respect to these revised figures would have been as follows:

Normal tax: 30% × $73,445.00 = _____ $22,033.50
Surtax: 22% × $48,445.00 ($73,445.00 − $25,000.00) = _____ 10,657.90

Total _____ 32,691.40

The Commissioner's computation under the "alternative" method was as follows:

Taxable income_____ $73,445.00
Less: Excess of net long-term capital gain over short-
    term capital loss_____ 83,787.64

                                                                   None

Partial tax (sec. 1201(a)(1)) on taxable income as thus
    reduced _____ None

Plus 25% × $83,787.64 (i.e., 25% of "such excess" of net
    long-term capital gain over short-term capital loss,
    pursuant to sec. 1201(a)(2))_____ 20,946.91

Total _____ 20,946.91

Since the tax computed by the "alternative" method was smaller ($20,946.91), that tax was used by the Commissioner in determining the deficiency.

In petitioner's income tax return for the year ending June 30, 1965, as a precautionary measure, it took a net operating loss deduction of $10,342.64. This amount represents the same net operating loss of $11,458.21 involved above, less $1,115.57, the amount of petitioner's ordinary taxable income for the year ending June 30, 1962. In his notice of deficiency relating to petitioner's taxable year ending June 30, 1965, the Commissioner made certain adjustments to taxable income and disallowed a claimed investment credit. The

petitioner does not now dispute these adjustments. The Commissioner also disallowed the net operating loss deduction on the ground that it had been allowed in full as a carryback to petitioner's taxable year ending June 30, 1962. The Commissioner concedes that petitioner's net operating loss of $5,181.18 for the taxable year ending June 30, 1966, should be allowed as a deduction in petitioner's taxable year ending June 30, 1965.

1. *Docket No. 838-66.*—The issue here is the proper computation of the "alternative" tax provided in section 1201(a) in a situation where there is an excess of long-term capital gain over short-term capital loss and where there is also a deficit in taxable income determined without regard to such excess. Section 1201 provides in pertinent part:

SEC. 1201. ALTERNATIVE TAX.

(a) CORPORATIONS.—If for any taxable year the net long-term capital gain of any corporation exceeds the net short-term capital loss, then, in lieu of the tax imposed by sections 11, 511, 821 (a) or (c), and 831(a), there is hereby imposed a tax (if such tax is less than the tax imposed by such sections) which shall consist of the sum of—

(1) a partial tax computed on the taxable income reduced by the amount of such excess, at the rates and in the manner as if this subsection had not been enacted, and

(2) an amount equal to 25 percent of such excess, or, in the case of a taxable year beginning before April 1, 1954, an amount equal to 26 percent of such excess.

In the case of a taxable year beginning before April 1, 1954, the amount under paragraph (2) shall be determined without regard to section 21 (relating to effect of change of tax rates).

It will be helpful in our discussion to use shorthand expressions for some of the terms in the statute. Thus we will refer to the "excess" of "net long-term capital gain * * * [over] the net short-term capital loss" as simply "capital gain"; to "taxable income reduced by the amount of such excess" as "ordinary income"; to "the tax imposed by sections 11, 511, 821 (a) or (c), and 831(a)" as tax computed by "the regular method"; to the computation specified in section 1201(a)(1) as the "ordinary income" portion of the "alternative" tax; and to the computation specified in section 1201(a)(2) as the "capital gain" portion of the "alternative" tax.

The dispute between the parties may be summarized as follows: Without taking into account the net operating losses sustained in 2 succeeding years, petitioner's taxable income for the year ending June 30, 1962, consisted of $1,115.57 in ordinary income and $83,787.64 in capital gain. A net operating loss of $11,458.21 was available to be

carried back to the year ending June 30, 1962. Petitioner's "taxable income" for the year is thus:

| | |
|---|---|
| Ordinary income | $1, 115. 57 |
| Capital gain | 83, 787. 64 |
| | 84, 903. 21 |
| Less: Net operating loss | 11, 458. 21 |
| Taxable income | 73, 445. 00 |

Accordingly, in determining petitioner's tax under the "regular" method the statutory rates are applied to a "taxable income" of $73,445. However, both parties agree that section 1201(a) is applicable to determine the amount of tax due, because under both of their methods of applying the carryback under that section the "alternative" tax due is less than that computed by the "regular" method.

The Commissioner's application of section 1201(a) to the figures involved is as follows. In determining the ordinary-income portion of the "alternative" tax, he found a deficit in ordinary income (since the capital gain exceeded taxable income) and thus found no tax. In determining the capital gains portion, he took 25 percent of "such excess" (i.e., capital gain). Petitioner disagrees only with the last step, arguing that the capital gain should be reduced by the deficit in ordinary income before the 25-percent tax is computed. Under the Commissioner's theory, petitioner's net operating loss carryback serves to reduce the tax due only to the extent that it reduces taxable income prior to the net operating loss ($84,903.21) to the level of capital gain ($83,787.64), i.e., to the extent of ordinary income ($1,115.57).

The Commissioner's computation under the "alternative" method follows scrupulously the terms of the statute. He first determined a "partial tax" under section 1201(a)(1) which, admittedly, was zero; and then he added under section 1201(a)(2) "an amount equal to 25 percent of * * * [the] excess" of the net long-term capital gain over the short-term capital loss. The provisions of the statute are set forth with such specificity that they admit of no such reading as that urged by petitioner, which seeks to subtract from "such excess" that portion of the carryback loss that was not absorbed in the computation of the "partial tax" in (a)(1). We hold that the Commissioner must be sustained. In so holding we have found that the issue is indistinguishable from the one decided in *Walter M. Weil*, 23 T.C. 424, affirmed 229 F. 2d 593 (C.A. 6), and that the legislative history supports the result reached.

The *Weil* case involved individual taxpayers and was decided under the Internal Revenue Code of 1939, but the critical facts were basically

the same as those in the present case: there was a large capital gain and a deficit in ordinary income. We held that the deficit could not be applied against the capital gain in computing the capital gains portion of the "alternative" tax. *Weil* dealt with section 117 of the 1939 Code, which, like section 1201 of the present Code, provided for the capital gains computation to be determined on "such excess," a phrase which referred to the excess of net long-term capital gain over net short-term capital loss. There was no explicit provision for reducing this excess by a deficit in ordinary income. In *Weil*, as here, the taxpayers argued that "such excess" should be limited to the amount of taxable income, i.e., by the capital gain less the ordinary income deficit. We refused in *Weil* to engraft such a limitation onto the plain words of the statute, and we refuse to do so here. Moreover, we found in *Weil* that our conclusion was supported by a detailed analysis of the legislative history of the taxation of capital gains, and we find this history equally persuasive here.

We need not repeat in its entirety the comprehensive analysis in this respect contained in *Weil*, but a brief outline of the legislative history will be helpful. Prior to the Revenue Act of 1921 capital gains were taxed in the same manner as ordinary income. In the 1921 Act an alternative method of computing tax on capital gain in the case of individuals was provided, at the election of the taxpayer. That method was similar to that provided in section 1201 of the present Code, calling for a partial tax on ordinary net income (net income exclusive of capital gain) computed at the regular rates, plus 12½ percent of "capital net gain," defined as the excess of capital gain over capital deductions and losses. See sec. 206 (a) (4) and (5) and 206 (b), Revenue Act of 1921. In section 208 (a) (5) the Revenue Act of 1924, the term "capital net gain" was redefined to mean—

the excess of the total amount of capital gain over the sum of (A) the capital deductions and capital losses, plus (B) the amount, if any, by which the ordinary deductions exceed the gross income computed without including capital gain * * *

The purpose of the change was to provide for a case like the one before us. See H. Rept. No. 179, 68th Cong., 1st Sess., p. 19. The Revenue Act of 1934, in section 117 (a), changed the method of taxing capital gain (in the case of individuals) : certain percentages of the gain (depending on the holding period) were to be "taken into account in computing net income." There was no variation in the tax rates applicable to ordinary income or the amount of capital gain thus taken into account.

The Revenue Act of 1938 continued in section 117 (b), with certain changes in percentages and holding periods, the method introduced in the 1934 Act, but in section 117 (c) an alternative tax was provided,

similar to that in section 1201 today. Section 117(c)(1) provided in pertinent part:

A partial tax shall first be computed upon the net income reduced by the amount of the net long-term capital gain, at the rates and in the manner as if this subsection had not been enacted, and the total tax shall be the partial tax plus 30 per centum of the net long-term capital gain.

"Net long-term capital gain" was computed without taking into account any deficit in ordinary income. Sec. 117(a)(8). By section 150 (c) of the Revenue Act of 1942, section 117(c) of the 1939 Code was amended to become applicable to corporations and to read substantially as does section 1201 of the present Code; no significant changes were made, however, by the 1942 Act in the provisions of the 1938 Act.

The conclusion drawn from this history in *Weil* and here is that since the 1924 Act specifically provided for the application of a deficit in ordinary income to capital gain in computing the capital gains portion of the tax, the absence of such a provision in the 1939 and 1954 Codes is of significance and prevents our reading in such a provision, for Congress knew how to deal with this problem when it wished to. While it is true that *Weil* was decided under the 1939 Code, we cannot agree that any change that could affect our conclusion was made in the 1954 Code. The House report on section 1201 stated:

This section is derived from section 117(c) of present law which provides the alternative tax on capital gains. No substantive change is intended although several working changes have been adopted for simplification. The computation of the alternative tax is described in two steps rather than three. H. Rept. No. 1337, 83d Cong., 2d Sess., p. A273.

See also S. Rept. No. 1622, 83d Cong., 2d Sess., p. 430; and Rev. Rul. 56-247, 1956-1 C.B. 383.

Petitioner argues that the new term "taxable income" as used in the 1954 Code (in contrast to "net income" in prior law) and in particular in section 1201 aids its cause. We conclude, however, that this new term (which is defined in sec. 63) was adopted for purposes of clarification and does not change the meaning of section 1201. Petitioner further attaches great importance to the last sentence of section 1201(a), which deals with change of tax rates and which had no counterpart in the 1939 Code. Petitioner argues since that sentence provides, for taxable years beginning before April 1, 1954, that the capital gains portion of the "alternative" tax is to be computed without regard to section 21 (relating to the effect of change of tax rates), that for years beginning after that date section 21 *is* to be taken into account. Petitioner then points out that section 21 provides for applying rates "to the taxable income" and concludes thereby that the amount of capital gain entering into the section 1201(a)(2) computation is

limited by the amount of "taxable income." We cannot believe that Congress intended to affect the operative scope of section 1201(a) by any such circuitous route, particularly in the light of the explicit statements in the reports of the congressional committees, *supra*, that section 1201 was "derived from section 117(c)" of the 1939 Code and that "No substantive change * * * [was] intended." We think that nothing in the 1954 Code calls for any result different from that reached in *Weil*.

Petitioner places great emphasis on an amendment to section 117(c) (1)(A) of the 1939 Code, passed as Pub. L. No. 399 (84th Cong., 2d Sess.) in 1956. An understanding of the importance petitioner attaches to this amendment requires some background. Section 26 (b), (h), and (i) of the 1939 Code provided for certain credits against income such as a credit for dividends received. The amount to be so credited was limited to a certain percentage of "adjusted net income." The Commissioner, in Rev. Rul. 54–28, 1954–1 C.B. 123, ruled that, if the income tax was computed under the "alternative" method, the amount of the credits allowable under section 26 was to be determined with reference to net income reduced by capital gain. Pub. L. No. 399 in effect overturned this ruling by providing that the credits were to be limited by a percentage of net income unreduced by capital gain.[1] Petitioner argues that this amendment illustrates congressional intent that there should be no "separate" capital gains tax and that deductions should be allowed against capital gain in computing the "alternative" tax if there is no ordinary income to which they may be applied. We think that Pub. L. No. 399 suggests the opposite conclusion. It was passed after *Weil* was decided, yet Congress did not see fit to change the statute to overrule the *Weil* result. Further, the problem involved in Pub. L. No. 399 was quite different from the problem involved here: that amendment clarified the meaning of "adjusted net income" for purposes of credits against income, whereas we are concerned with whether capital gain may be reduced by ordinary deductions in computing the "alternative" tax, a matter governed by the explicit language of section 1201(a)(2), which is not susceptible of verbal manipulation.

Petitioner next points to several cases that allegedly disapprove the rationale of *Weil*. First, there are three District Court cases holding former section 1.34–2 of the Income Tax Regulations invalid: *Springs* v. *United States*, 153 F. Supp. 514 (W.D.S.C.); *Schultz* v. *United States*, 156 F. Supp. 811 (S.D. Fla.); *Cruickshank* v. *Riddell* (S.D. Cal., 1 A.F.T.R. 2d 727, 58–1 U.S.T.C. par. 9169). That regu-

---

[1] Pub. L. No. 399 was effective for taxable years beginning after Dec. 31, 1951. In *Pitcairn Co.* v. *United States*, 180 F. Supp. 582 (Ct. Cl.), Rev. Rul. 54–28 was held to be invalid for prior years as well.

lation dealt with section 34 of the 1954 Code (now repealed) providing for a credit against tax for dividends received, limited by a certain percentage of "taxable income." It provided that, where the "alternative" method of computing tax was used, "taxable income," for purposes of limiting the amount of section 34 credit, did not include capital gain. This regulation was held invalid in the cases mentioned above. We do not believe, however, that the regulation was in any sense required by *Weil* or that its invalidity is in any way inconsistent with *Weil*. Those cases turn upon the meaning and scope of the statutory provisions dealing with the amounts to be allowed as credits. Here we are concerned only with the meaning of "such excess" in section 1201 (a) (2)

More in point, but still clearly distinguishable from the present case, and from *Weil*, are several cases that have allowed certain deductions to be taken against capital gain in computing the "alternative" tax. The particular deductions involved in these cases were all different from the deductions here and in *Weil*, and in none of these cases was *Weil* disapproved. In *United States* v. *Memorial Corp.*, 244 F. 2d 641 (C.A. 6), the corporate taxpayer, in its final tax return after liquidation, was sustained by the court in its deduction of unamortized expenses of selling securities from the capital gains portion of the "alternative" tax computation. The court, however, emphasized the *capital nature* of the deductions, and carefully distinguished its own prior decision in *Weil*. In *Read* v. *United States*, 320 F. 2d 550 (C.A. 5), and *Meissner* v. *United States*, 364 F. 2d 409 (Ct. Cl.), the deduction provided in section 691(c) was allowed to be applied against capital gain in computing the "alternative" tax. Both cases, however, stressed the special nature of the deduction involved: that it was designed to prevent double taxation by allowing a deduction for estate taxes paid on items giving rise to income in respect of a decedent when income is realized from such items. Further, *Meissner* points out that the section 691 deduction is not a deduction used to compute "taxable income" under section 63(a); the section states merely that the deduction "shall be allowed." See 364 F. 2d at 413. The final case relied on by petitioner is *Statler Trust* v. *Commissioner*, 361 F. 2d 128 (C.A. 2), reversing 43 T.C. 208, in which a trust computing its tax by the "alternative" method was allowed to deduct from capital gains income capital gain contributed to charity. Once again, however, the Court of Appeals carefully distinguished *Weil*, pointing to the conduit theory of the taxation of trust income and making analogy to a distribution of capital gains to beneficiaries. In short, while these cases have certainly not extended *Weil*, they have not weakened its vitality in the context in which it arose, the same type of context present in this case. Indeed, in *Meissner* the court proceeded on the assumption

that it was merely approving an "exception" to the "general rule" of *Weil*, 364 F. 2d at 413.

Petitioner seeks to demonstrate the alleged inequity of the *Weil* doctrine by pointing out that a taxpayer (whose capital gain is so large as to make the "alternative" method of computing taxes more advantageous than the "regular" method) with a deficit in ordinary income will pay the same amount of tax regardless of the size of the deficit. Petitioner argues that the *Weil* doctrine creates an artificially separate tax on capital gains which ignores ordinary income and deduction, and which Congress did not intend to create. The short answer is that the legislative history demonstrates that Congress did intend to make such a distinction between the two elements of the "alternative" tax, at least to the extent of the *Weil* doctrine, and that result is required by the plain words of the statute.

2. *Docket No. 2116–67.*—Both parties are agreed that of the net operating loss of $11,458.21 that petitioner attempted to carry back to its taxable year ending June 30, 1962, $1,115.57 was absorbed in offsetting that amount of ordinary income for that year. We have held above that the remaining $10,342.64 cannot be applied to reduce petitioner's capital gain in computing the alternative tax for the year ending June 30, 1962. Petitioner contends that, given the holding in docket No. 838–66, it should be allowed to carry forward the $10,342.64 to its taxable year ending June 30, 1965. The parties apparently have not agreed on whether petitioner's income tax liability for that year will be determined by the "regular" or "alternative" method, and the choice may be affected by our determination of this issue. Both computations must of course be made to determine which produces the lower tax. In computing the tax by the "alternative" method, it is clear from our discussion above that any net operating loss carryforward that we may find to be available may be applied only to the ordinary-income portion of that computation. Under the "regular" method, of course, any allowable carry-forward may be applied to taxable income unreduced by capital gain.

The applicable statutory provisions relating to the present issue are contained in section 172(b)(2), which provides:

(2) AMOUNT OF CARRYBACKS AND CARRYOVERS.—Except as provided in subsections (i) and (j) [not here pertinent], the entire amount of the net operating loss for any taxable year (hereinafter in this section referred to as the "loss year") shall be carried to the earliest of the taxable years to which (by reason of paragraph (1)) such loss may be carried. The portion of such loss which shall be carried to each of the other taxable years shall be the excess, if any, of the amount of such loss over the sum of the taxable income for each of the prior taxable years to which such loss may be carried. * * *

The Commissioner focuses on the last sentence above and argues that "The portion of such loss which shall be carried to" the year ending

June 30, 1965, is zero, since there is no "excess * * * of the amount of such loss over the sum of the taxable income for each of the prior taxable years to which such loss may be carried." The loss of $11,458.21 carried back to the year ending June 30, 1962, was less than the "taxable income" for that year computed without regard to the loss ($84,-903.21). Thus, the argument continues, there remains no excess to be carried forward.

The Commissioner contends that the full $11,458.21 was in fact "absorbed" in computing petitioner's tax for the year ending June 30, 1962, because it was used in full to reduce taxable income in computing tax by the "regular" method, although the actual tax liability was determined by the "alternative" method. We hold otherwise. The computation under the "regular" method was merely tentative, to determine whether the "regular" method would produce a smaller tax. Since it did not produce a smaller tax, it was in effect not employed at all as a measure of petitioner's 1962 tax, and under the actual computation used (the "alternative" method) only $1,115.57 of the net operating loss was absorbed, leaving the remaining $10,-342.64 to be carried forward to 1965. This result is required by a proper interpretation of the provisions dealing with carrybacks and carryovers.

Provisions for applying net losses from one taxable year to other taxable years have been a part of the tax law since 1918. See sec. 204, Revenue Act of 1918. The purpose of such provisions is obviously to ameliorate somewhat the arbitrary nature of the annual accounting period, especially in the case of businesses with great fluctuations in income from year to year. Thus, section 172 is clearly designed to allow taxpayers, within the limits of the periods specified, to offset profits from one year with losses from other years in computing their tax liabilities.

In the instant case, petitioner used, in computing its actual tax liability, i.e., in computing its tax by the "alternative" method provided in section 1201(a), only $1,115.57 of its net operating loss to offset taxable income from the year ending June 30, 1962. In keeping with the purpose of section 172, the remaining $10,342.64 should be used to offset gains in other years to which it may be carried. We think that nothing in that section prohibits the carry-forward of that amount to the year ending June 30, 1965. The pertinent sentence in section 172(b)(2) is "The portion of such loss which shall be carried to each of the other taxable years shall be the excess, if any, of the amount of such loss over the sum of the taxable income for each of the prior taxable years to which such loss may be carried." We agree with petitioner's contention that the phrase "to which such loss may be carried" modifies "taxable income" as well as "each

of the prior taxable years." We further hold that "taxable income" in this context (as modified by the above phrase) means that taxable income to which the loss is actually applied in computing actual tax liability. In this case, since the tax for petitioner's year ending June 30, 1962, was computed by the "alternative" method, the only taxable income to which the loss could be carried was the $1,115.57 of ordinary income for that year. We think it is to exalt form over substance to contend that, since a "regular" computation was made in order to determine whether the amount of tax resulting therefrom was greater than that produced by the "alternative" method of computation, and since the net operating loss was deducted in full in the "regular" method, the entire loss was therefore taken into account in the tax computation, even though the "alternative" method, to which only $1,115.57 was applied, ultimately produced petitioner's actual tax liability. We hold, therefore, that the "excess" of the net operating loss referred to in section 172(b)(2) which may be carried to petitioner's taxable year ending June 30, 1965, is $10,342.64.

*Decisions will be entered under Rule 50.*