**MUTUAL ASSURANCE SOCIETY OF VIRGINIA CORPORATION,**
Appellee,

v.

**COMMISSIONER OF INTERNAL REVENUE, Appellant.**

No. 74–1133.

United States Court of Appeals,
Fourth Circuit.

Argued June 5, 1974.

Decided Oct. 18, 1974.

Robert G. Burt, Atty., Tax Div., U. S. Dept. of Justice (Scott P. Crampton, Asst. Atty. Gen., Meyer Rothwacks and Bennet H. Hollander, Attys., Tax Div., U. S. Dept. of Justice, on brief), for appellant.

Frank W. Hardy, Richmond, Va. (Williams, Mullen & Christian, Richmond, Va., on brief), for appellee.

Before WINTER, CRAVEN and RUSSELL, Circuit Judges.

WINTER, Circuit Judge:

In this appeal we must decide whether, where a net operating loss has been carried back and used in computing taxable income as a step in determining a taxpayer's tax for an earlier year under the alternative method of taxing capital gains, the excess of the net operating loss deduction over ordinary income for the earlier year may be carried forward to a succeeding year. The Tax Court held that it could.[1] Its holding is in accord with the views of the First, Eighth and Ninth Circuits;[2] but from our analysis of the applicable statutes and

their legislative history, we are constrained to disagree. We reverse the decision from which the appeal is taken.

### I.

Mutual Assurance Society of Virginia Corporation (Taxpayer) is a Virginia insurance corporation which incurred a "net operating loss," as defined by I.R.C. § 172(c),[3] in the amount of $83,059.-04 for its 1969 tax year. Under § 172(b)(1)(A)(i), such loss is a "net operating loss carryback" to each of the three taxable years preceding 1969.[4] Section 172(a) allows a deduction for the taxable year of the amount of the net operating loss carrybacks to such year.[5] Taxpayer's returns for the three tax years preceding 1969 reflect the following income figures, without taking into account the carryback generated by the 1969 net operating loss:

| Year | Net Ordinary Income | Excess of Net Long Term Capital Gain Over Net Short Term Capital Loss | Taxable Income |
|------|--------------------|-----------------------------------------------------------------------|----------------|
| 1966 | -------- | -------- | ($ 34,818.68) |
| 1967 | $72,575.10 | $209,253.60 | $281,828.70 |
| 1968 | $55,626.69 | $582,230.04 | $637,856.73 |

A net operating loss must be carried to the earliest possible year to which it may be carried—in this case, 1966—and any excess of such loss over the taxable

income for such year—computed without regard to the carryback deduction—is available as a deduction in the next succeeding tax year. This process may be

1. Mutual Assurance Society of Virginia, 1973 P–H Memo T.C. ¶ 73,177 (Aug. 8, 1973).

2. Chartier Real Estate Co. v. Commissioner, 52 T.C. 346 (1969), aff'd per curiam, 428 F.2d 474 (1 Cir. 1970); Foster Lumber Co. v. United States, 500 F.2d 1230 (8 Cir. 1974); Olympic Foundry Co. v. United States, 493 F.2d 1247 (9 Cir. 1974).

3. All references contained herein are to the Internal Revenue Code of 1954 (26 U.S.C.) unless otherwise indicated. The text of § 172(c) is:

For purposes of this section, the term "net operating loss" means (for any taxable year ending after December 31, 1953) the excess of the deductions allowed by this chapter over the gross income. Such excess shall

be computed with the modifications specified in subsection (d).

4. Section 172(b)(1)(A) provides:
Except as provided in clause (ii) and in subparagraph (D), a net operating loss for any taxable year ending after December 31, 1957, shall be a net operating loss carryback to each of the 3 taxable years preceding the taxable year of such loss.

5. Section 172(a) reads:
There shall be allowed as a deduction for the taxable year an amount equal to the aggregate of (1) the net operating loss carryovers to such year, plus (2) the net operating loss carrybacks to such year. For purposes of this subtitle, the term "net operating loss deduction" means the deduction allowed by this subsection.

repeated until the loss is exhausted or until the fifth tax year succeeding the loss year, whichever comes first. I.R.C. § 172(b)(2). Since Taxpayer had no taxable income for 1966, the full amount of the 1969 net operating loss is available as a deduction in 1967. The Commissioner has refunded to Taxpayer the amount by which its 1967 income tax liability—computed under the alternative tax provision of § 1201(a)—was reduced by the allowance of a carryback deduction in respect of the 1969 net operating loss.[6] The present dispute concerns whether any of the 1969 net operating loss is available for a deduction in 1968.

The dispute between the Commissioner and Taxpayer concerning the extent to which the 1969 net operating loss was, figuratively speaking, "absorbed" in 1967, arises out of two circumstances: (1) the net operating loss in 1969 was greater than Taxpayer's net ordinary income for 1967; and (2) the tax on Taxpayer's recomputed income for 1967 was determined under the alternative tax provision of § 1201(a). In explanation of the latter, it must be stated that § 1201(a)[7] provides that, for any year in which a corporation has a "net section 1201 gain," i. e., a capital gain, the alternative tax set forth in that section is imposed in lieu of the tax imposed on the income of corporations by § 11 if, and only if, such alternative tax is less than the § 11 tax. By the terms of § 1201(a), the alternative tax is computed by a two-step computation. The first step is to reduce taxable income—gross income (including capital gains) less deductions—by the amount of the taxpayer's capital gains. The result is the taxpayer's ordinary income. A partial tax calculated under § 11 is then imposed on this figure. In the second step, a flat percentage rate is imposed upon the entire amount of the taxpayer's capital gains. The alternative tax is the sum of the partial taxes computed under steps one and two.

In a case where a taxpayer's deductions exceed the amount of his ordinary income, such excess does not reduce the amount of the taxpayer's capital gains that is subject to step two of the alternative tax. Weil v. Comm'r., 229 F.2d 593 (6 Cir. 1956), aff'g 23 T.C. 424 (1954); Rev.Rul. 56-247, 1956–1 Cum. Bull. 383. This rule has been applied to the situation in which the allowance of a net operating loss carryback or carryover deduction causes a taxpayer's total deductions to exceed his ordinary income. Chartier Real Estate Co., 52 T.C. 346, 350–356 (1969), aff'd per curiam, 428 F.2d 474 (1 Cir. 1970); Horace Drew, 41 P–H Memo T.C. ¶ 72,040 (Feb. 17, 1972). As a result of these rules, the excess of Taxpayer's 1969 net operating loss over its net ordinary income for

---

6. The proceedings before the Commissioner have been stated in the text in a simplified form in order to avoid distraction by extraneous details. Taxpayer had originally claimed a net operating loss of $94,008.15 for 1969. The Commissioner originally made a refund of 1968 taxes on the basis of a carryback deduction of $21,433.05—the difference between $94,008.15 and Taxpayer's net ordinary income for 1967. In a subsequent audit, Taxpayer agreed to a reduction in the total amount of the 1969 loss to $83,059.04. Consequently Taxpayer agreed to the disallowance of the loss carryback deduction for 1968 to the extent of $10,949.11—the difference between $94,008.15 and $83,059.04—and paid a resulting deficiency of $5,736.14. Thus, Taxpayer is now only contesting the disallowance of a deduction in 1968 of the amount by which its 1969 net operating loss

—recomputed by agreement—exceeds its net ordinary income for 1967.

7. Section 1201(a) provides:
If for any taxable year the net long-term capital gain of any corporation exceeds the net short-term capital loss, then, in lieu of the tax imposed by sections 11, 511, 821(a) or (c), and 831(a), there is hereby imposed a tax (if such tax is less than the tax imposed by such sections) which shall consist of the sum of—
  (1) a partial tax computed on the taxable income reduced by the amount of such excess, at the rates and in the manner as if this subsection had not been enacted, and
  (2) an amount equal to 25 percent of such excess, or, in the case of a taxable year beginning before April 1, 1954, an amount equal to 26 percent of such excess.

1967 had no impact upon the calculation of Taxpayer's liability for 1967 under the alternative tax provisions.

The method of computing the alternative tax and the limitations on use of the carryback deduction can be illustrated by running through the computation of Taxpayer's 1967 tax liability, taking into account the loss carryback deduction:

### Regular Method (§ 11)

| | |
|---|---:|
| Taxable income | $281,828.70 |
| Less: carryback deduction resulting from 1969 net operating loss | 83,059.04 |
| Recomputed taxable income | $198,769.66 |
| § 11 tax on recomputed taxable income | $ 88,909.44 |

### Alternative Method (§ 1201(a))

| | | |
|---|---:|---:|
| Net ordinary income | $ 72,575.10 | |
| Capital gains | 209,253.60 | |
| Taxable income | | $281,828.70 |
| Less: carryback deduction resulting from 1969 net operating loss | | 83,059.04 |
| Recomputed taxable income | | $198,769.66 |

#### (Step 1)

| | |
|---|---:|
| Less: capital gains | $209,253.60 |
| Balance | ($10,483.94) |
| Partial tax at § 11 rates on balance | –0– |

#### (Step 2)

| | |
|---|---:|
| Capital gain | $209,253.60 |
| 25% tax on capital gain | 52,313.40 |
| Total alternative tax | $ 52,313.40 |

---

In the illustration, the alternative tax under § 1201(a) applies since it is lower than the § 11 tax. It will be seen that the net operating loss carryback from 1969—$83,059.04—affected the computation of the partial tax under Step 1 only to the extent of eliminating $72,575.10 of net ordinary income. The excess of such loss over net ordinary income—$10,483.94—had no impact on the calculation of Step 2 of the alternative tax since, under the rule in *Weil*, such excess is not permitted to be applied to reduce the amount of capital gain subject to the 25% rate.

In the instant appeal, Taxpayer contends that $10,483.94 of its 1969 net operating loss carryback was not used up in the computation of its tax liability for 1967 and, therefore, the excess should be available as a deduction in determining its 1968 tax liability. The

Commissioner takes the view that, when a net operating loss carryback or carryover is allowed as a deduction in a particular tax year, only the excess of such loss over the taxable income for such year, as defined by § 63(a)—gross income (including capital gains) less deductions—is available as a deduction in succeeding tax years.

As has been stated, the Tax Court, in a memorandum decision, decided in favor of Taxpayer on review of the deficiency assessment against it. The Tax Court's decision rested solely on the authority of its prior decision in Chartier Real Estate Co., 52 T.C. 346, 356–358 (1969), aff'd per curiam, 428 F.2d 474 (1 Cir. 1970). The Commissioner concedes that the Tax Court's decision of the second issue in *Chartier Real Estate* cannot be distinguished from the instant case. On this appeal the Commissioner contends that *Chartier Real Estate* was wrongly decided and, hence, should not be adopted as the rule in this circuit. We treat the Commissioner's argument as extending to subsequent cases which have followed *Chartier Real Estate* and those in accord with its holding.

### II.

The amount of a net operating loss carryback or carryover to any tax year is determined under § 172(b)(2):

> Except as provided in subsections (i) and (j) [inapplicable here], the entire amount of the net operating loss for any taxable year (hereinafter in this section referred to as the "loss year") shall be carried to the earliest of the taxable years to which (by reason of paragraph (1)) such loss may be carried. *The portion of such loss which shall be carried to each of the other taxable years shall be the excess, if any, of the amount of such loss over the sum of the taxable income for each of the prior taxable years to which such loss may be carried.* (Emphasis added.)

The italicized sentence of § 172(b)(2) clearly governs the problem before the court. It plainly says that, when a net operating loss carryback is allowed as a deduction in any tax year, the amount of such loss available as a deduction in succeeding tax years is the excess of such loss over the *"taxable income"* (emphasis added) for the tax year in which the deduction is allowed. Section 172 does not contain any definition of the term "taxable income," but a general definition of such term is found in § 63(a):

> . . . for purposes of this subtitle the term "taxable income" means gross income, minus the deductions allowed by this chapter . . . .

"Gross income" is, in turn, defined by § 61(a)(3) to include "gains derived from dealings in property." If "taxable income," as used in the second sentence of § 172(b)(2), means "taxable income" as defined in § 63(a), then the Commissioner's position is obviously correct.

Because we think the Tax Court erroneously decided *Chartier Real Estate* in the holding which concerns us, we must discuss its decision in some detail. In its analysis of the problem, the Tax Court began from what it divined to be the purpose of the net operating loss carryback and carryover provisions:

> Provisions for applying net losses from one taxable year to other taxable years have been a part of the tax law since 1918. See sec. 204, Revenue Act of 1918. The purpose of such provisions is obviously to ameliorate somewhat the arbitrary nature of the annual accounting period, especially in the case of businesses with great fluctuations in income from year to year. Thus, section 172 is clearly designed to allow taxpayers, within the limits of the periods specified, to offset profits from one year with losses from other years in computing their tax liabilities. 52 T.C. at 357.

The Tax Court then concluded that it was in keeping with this purpose to permit the excess of a net operating loss over the net ordinary income for a year to which such loss is carried to be deducted in succeeding years, if such ex-

cess does not affect the computation of the tax actually imposed for the year to which the loss is carried because of the applicability of the alternative tax under § 1201(a).[8]

Turning then to the language of § 172(b)(2), the Tax Court found nothing therein that stood in the way of the result that it felt was dictated by the policy underlying § 172. First, it concluded that the phrase "to which such loss may be carried" in the second sentence of § 172(b)(2) modified the term "taxable income" as well as the phrase "each of the prior taxable years." It then concluded that the term "taxable income" (as so modified) meant "taxable income to which the loss is actually applied in computing actual tax liability." 52 T.C. at 358. The First Circuit affirmed the Tax Court's resolution of this issue in a brief per curiam opinion which dismissed the issue as "unimportant and seldom occurring." 428 F.2d at 475.

Courts that have subsequently dealt with this issue have uniformly followed the Tax Court's decision in *Chartier Real Estate.* Olympic Foundry Co. v. U. S., 72–1 USTC ¶ 9299 (W.D.Wash.1972), aff'd per curiam, 493 F.2d 1247 (9 Cir. 1974); Sidney Axelrod, 32 TCM 885 (1973) appeal pending (6 Cir.); Naegele v. United States, 383 F.Supp. 1041 (D.Minn.1973) appeal pending (8 Cir.); Continental Equities, Inc., P–H Memo TC ¶ 74,189 (July 25, 1974); Foster Lumber Co., Inc. v. United States, 500 F.2d 1230 (8 Cir. 1974). With the exception of *Foster Lumber Co.,* these cases apply the rule in *Chartier Real Estate* with little discussion of the soundness of that decision. Occasionally one finds the remark that the phrase "to which such loss may be carried" would be surplusage unless "taxable income" is construed in the manner indicated by the Tax Court. *Olympic Foundry.* The dis-

trict court in *Naegele,* in addition to adopting the reasoning in *Chartier Real Estate,* rejected a somewhat cryptically described argument advanced by the government in an attempt to establish certain untoward consequences flowing from the rule in *Chartier Real Estate.*[9]

The Eighth Circuit's recent opinion in *Foster Lumber Co.* contains the most lengthy discussion of this issue of all the cases that follow *Chartier Real Estate.* Its conclusion concerning the natural import of the statutory language of § 172(b)(2) is somewhat less ambitious than the Tax Court's. It took the view that both the Commissioner's and the Tax Court's interpretation of the last sentence of that section were equally plausible. It concurred with the Tax Court's view that the interpretation favorable to the taxpayer was in accord with the basic purposes of § 172; and it stated that the contrary interpretation would, in a manner left unspecified by the court, "frequently subject otherwise similarly situated taxpayers to significantly different treatment solely on the basis of arbitrary timing; precisely the reverse of section 172's original purpose." 500 F.2d at 1232. Finally, the Eighth Circuit alluded to certain unspecified "divisiveness and administrative confusion that a contrary conclusion at this point might foster" as a ground for its decision. 500 F.2d at 1233.

### III.

We find the Tax Court's reasoning in *Chartier Real Estate* and the Eighth Circuit's reaffirmation of that reasoning in *Foster Lumber Co.* unpersuasive. Unlike the Tax Court, we turn first to the language of the statute. The precise question is whether the term "taxable income," as used in the second sentence of § 172(b)(2), means "taxable income," as defined by § 63(a) of the Code, or whether it means "net ordinary income

---

8. In Lone Manor Farms, Inc., 61 T.C. No. 48 (Jan. 3, 1974), the Tax Court declined to extend the rule in *Chartier Real Estate* to a case where the carryback was ineffective to alter the tax in the year to which it must be

carried because the tax in that year was not in issue.

9. What this argument may have been, and its bearing on the issue now before the court will be discussed, *infra.*

in cases where the alternative tax is used to determine the tax liability upon the recomputed taxable income."

The Tax Court's analysis of the syntax of the second sentence of § 172(b)(2) is unconvincing. Under any natural reading of that sentence, the clause "to which such loss may be carried" modifies only the immediately preceding term "each of the prior taxable years." It is not necessary to suppose that the clause modifies the unlikely referent—"taxable income"—in order to prevent such clause from being "meaningless and superfluous." Its function in the sentence is plain: to identify those years whose taxable incomes must be taken into account to determine whether any excess of a loss carryover or carryback remains available as a deduction in any given year. If the clause were eliminated, the reader would be left wondering which taxable years were being referred to. Perhaps he might be able to infer from the overall structure of § 172 that the earliest year to which the loss could be carried and the subsequent intervening years were meant. But a clause which expressly resolves a matter which might have been left to implication is hardly "meaningless and superfluous"; it is just good draftsmanship.[10]

Even if the clause were read to modify "taxable income," we are not persuaded that "taxable income . . . to which such loss may be carried" means "taxable income to which the loss is actually applied in computing actual tax liability." If Congress had intended to enact the rule in *Chartier Real Estate,* it certainly chose an obscure verbal formula to convey this meaning. We think that the Tax Court has simply failed to point to any evidence in the statutory

language indicating that "taxable income" means something other than "taxable income" as defined by § 63(a) of the Code for the purposes of the entire income tax subtitle.

■ Our own examination of the statutory language of § 172 convinces us that there is positive evidence, on the face of the statute, that "taxable income" as used in the second sentence of § 172(b)(2) means "taxable income" as defined by § 63(a) regardless of whether the regular or the alternative tax applies in computing liability for the tax year to which the loss is carried. The third sentence of § 172(b)(2) provides that:

> For purposes of the preceding sentence, the taxable income for any such prior taxable year shall be computed—
>
>> (A) with the modifications specified in subsection (d) other than paragraphs (1), (4), and (6) thereof; . . . .

One of the modifications required to be made to "taxable income" by the above provision is that set forth in § 172(d)(2)(B):

> In the case of a taxpayer other than a corporation—
>
> .   .   .   .   .   .
>
> (B) the deduction for long-term capital gains provided by section 1202 shall not be allowed.

Thus, the statute expressly provides that, in computing a noncorporate taxpayer's taxable income in the year to which a loss is carried in order to determine the excess available for subsequent years, the deduction for long-term capital gains is not to be allowed. Such deduction is only allowed in the first place if taxable income is determined in the manner set forth in § 63(a)—gross in-

---

10. The phrase "to which such loss may be carried" did not appear in the post-1939 predecessors of § 172 until the enactment of the 1954 Code. No mention of the significance of this phrase—which the Tax Court parsed in an unusual manner to reach the result in *Chartier Real Estate*—can be found in the legislative history of the 1954 Code. This circumstance lends support to our belief that

the phrase was used merely for identification purposes as a substitute for the phrase "intervening years" which had appeared in prior versions. Act of September 23, 1950, 81st Cong., 2d Sess., Ch. 994 § 215, 64 Stat. 937. If that phrase had a more ambitious object, the committee reports ordinarily would be expected to have elucidated it.

\

come (including capital gains) minus deductions. In any case in which a noncorporate taxpayer's liability for the year to which a loss is carried is determined under the alternative tax provision,[11] he will have deducted fifty percent of his long-term capital gains in computing his taxable income, but the statute directs him to add this deduction back into taxable income before computing the excess of a net operating loss carryover or carryback that remains available for deduction in subsequent years.

Little sense can be made out of this addback provision in the case of a noncorporate taxpayer unless "taxable income" means "section 63(a) taxable income." If, as the Tax Court holds, "taxable income" means net ordinary income in cases where the alternative tax is applicable, then § 172(d)(2)(B) would require disallowance of a deduction that was not actually used in computing "taxable income." It is difficult to conclude that § 172(d)(2)(B) was intended to be meaningless and hence we think that with regard to noncorporate taxpayers it is statutory evidence that "taxable income" means "taxable income" as defined in § 63(a).

Of course § 172(d)(2)(B) does not apply to a corporate taxpayer. Nevertheless, the inference that we have drawn from that provision concerning the meaning of "taxable income," as used in § 172(b)(2), is applicable in the case of a corporate taxpayer. There is nothing in the language of the statute to indicate that Congress intended to have two concepts of "taxable income" for the purpose of determining how much of a

net operating loss carryback is available for further deduction after it is allowed in a particular year: one for corporate and one for noncorporate taxpayers. Moreover, no occasion for an addback provision like § 172(d)(2)(B) arises in the case of a corporate taxpayer, since the full amount of its capital gains for the year is included in a corporation's taxable income. It is given no deduction corresponding to § 1202 for its long-term capital gains. Despite the conclusions we draw, we recognize that the Tax Court applies the rule in *Chartier Real Estate* indiscriminately between corporate and noncorporate taxpayers.[12]

Overall, we are persuaded that the language and structure of § 172 points decidedly in the direction that "taxable income" in § 172(b)(2) has its ordinary Code meaning as defined in § 63(a).

We are constrained to disagree with the Eighth Circuit's view that the language of § 172(b)(2) is equally susceptible to both the Commissioner's and the Tax Court's interpretation. The Eighth Circuit accepted without discussion the assumption that the phrase "to which such loss may be carried," insofar as it may be taken to modify "taxable income," must mean "whose reduction by the application of such loss actually reduces the amount of tax liability thereon." For the reasons we have set forth, we are unable to accept that assumption. We note also that the Eighth Circuit apparently did not have before it the significance of § 172(d)(2)(B) when it concluded that it was unable to find any plain meaning in the statutory provision under consideration. Had the Eighth Circuit been directed to this provision, it

---

11. Section 1201(b), the alternative tax for noncorporate taxpayers, works in the same manner as § 1201(a), and has the same capacity to produce the situation presently under consideration, given the right combination of capital gains and ordinary income in the year to which a loss is carried. See, *Sidney Axelrod*, supra. Since fifty percent of the long-term capital gains of the noncorporate taxpayer have already been deducted in computing taxable income, only fifty percent of long-term capital gains are subtracted from

taxable income in computing the amount upon which the partial tax under step 1 is imposed.

12. See, Sidney Axelrod, 32 TCM 885 (1973), appeal pending (6 Cir.). It is obvious from the Tax Court's opinion in *Sidney Axelrod* that the significance of § 172(d)(2)(B) was not put in issue by the Commissioner. A reading of the facts of the case indicates that, had the addback provision of § 172(d)(2)(B) been applied to the individual taxpayer before the court, the decision would have gone for the Commissioner.

may well have been able to discern on the face of the statute a definite indication that "taxable income" as used in § 172(b)(2) has its ordinary Code meaning.

### IV.

We turn then to the legislative history of the net operating loss provisions to see if there is support for the Tax Court's special judicial definition of "taxable income" in order to further the obvious purpose of the statute. See, Haggar Co. v. Helvering, 308 U.S. 389, 394, 60 S.Ct. 337, 84 L.Ed. 340 (1940).

The history of net loss carryover deductions in the federal income tax law unfolds in two distinct and disjointed phases. The first enactment of a provision permitting the excess of expenses incurred in one tax year over gross income for such year to be deducted in another tax year came in the Revenue Act of 1918.[13] Section 204(b) of that Act permitted a "net loss" to be deducted from gross income in the year immediately preceding the loss year. Any excess of such loss over "net income" for the year immediately preceding the loss was allowed as a deduction in the year immediately succeeding the loss. The question presented by this case could not arise in 1919, because, at that time, special treatment was not accorded to gains derived from the sale or exchange of capital assets. An alternative tax for noncorporate taxpayers having capital gains was first enacted in the Revenue Act of 1921.[14] This provision was structurally identical to the alternative tax presently in effect. It was the sum of two partial taxes: (1) the normal rate of taxes upon the "ordinary net income"; plus (2) a certain percentage of the "capital net gain." The term "capital net gain" was defined in such a way that any excess of ordinary deductions over ordinary income would not reduce the amount of capital gains subject to the second step of the alternative tax. Thus, when juxtaposed with the net loss provision, § 204(b), which provided that only the excess of net loss deduction over net income would be available as a deduction in a succeeding year, the alternative tax provision of 1921 contained the same features upon which Taxpayer's contentions here are founded.

However, the Revenue Act of 1924 amended the alternative tax provision in such a way as to foreclose the possibility that the present dispute could have arisen under the 1924 Code. "Capital net gain" was redefined to provide that any excess of deductions over ordinary income would reduce the amount of capital gains subject to the second step of the alternative tax.[15] Thus, to the extent that a net loss carryback exceeded net ordinary income for the year in which it was allowed as a deduction, it reduced the amount of capital gains subject to step two of the alternative tax, so that it was not possible to argue that such excess had no impact on the actual computation of the tax.[16]

For the next nine years the statute contained the above-described provisions which, it should be noted, provide for a result directly contrary to the rule in the *Weil* case. In 1933, the National Industrial Recovery Act abolished all net loss carryovers and carrybacks.[17] In 1934, the alternative tax method of dealing with capital gains was discarded in

---

13. Act of February 24, 1919, 65th Cong., 3d Sess., Ch. 18, § 204, 40 Stat. 1060.

14. Act of November 23, 1921, 67th Cong., 1st Sess., Ch. 136, § 206, 42 Stat. 232. Favorable treatment of long-term capital gains was not extended to corporate taxpayers until 1942. Act of October 21, 1942, 77th Cong., 2d Sess., Ch. 619, § 150(c), 56 Stat. 843.

15. Act of June 2, 1924, 68th Cong., 1st Sess., Ch. 234, § 208(a)(5), 43 Stat. 262.

16. The net loss provisions were also amended to make clear that the net loss would first offset net ordinary income for the year to which it carried, then capital gains. If any excess remained after both of these elements of net income were eliminated, such excess would be available for deduction in subsequent years in the same manner. § 206(c) & (d), 43 Stat. 261.

17. Act of June 16, 1933, 73d Cong., 1st Sess., Ch. 90, § 218(a), 48 Stat. 209.

favor of a percentage exclusion from net taxable income approach.[18]

In the Revenue Act of 1938, an alternative tax provision was superimposed upon the then-existing percentage exclusion approach to noncorporate taxpayers having capital gains.[19] The definition of the item subject to step two of the alternative tax—"net long term capital gain"—contained no provision calling for the reduction of such amount by the excess of ordinary deductions over ordinary income. This sharp contrast with the alternative tax provision prevailing between 1924 and 1934—a contrast which persists to the present—led to the decision in *Weil* that the amount by which ordinary deductions exceeded ordinary income could not be used to reduce the amount of capital gains subject to step two of the alternative tax. 23 T.C. at 429–30.

In 1939, a net operating loss carryover provision was reintroduced.[20] It provided that a net operating loss could be carried forward to the two years succeeding the year in which the loss was incurred. The amount of the loss available for deduction in the second year succeeding the loss was provided for in the following terms:

The term 'net operating loss carryover' means in the case of any taxable year the sum of:

(1) [the loss for the first preceding year];

(2) The amount of the net operating loss, if any, for the second preceding taxable year reduced by the excess, if any, of the net income . . . for the first preceding taxable year over the net operating loss for the third preceding taxable year.

This provision is the predecessor of the present § 172. Its basic purpose is described in the House Committee report:

As a result of the elimination of this carryover [referring to the abolition of carryovers by the NIRA in 1933], a business with alternating profit and loss is required to pay higher taxes over a period of years than a business with stable profits, although the average income of the two firms is equal. New enterprises and the capital goods industries are especially subject to wide fluctuations in earnings. It is, therefore, believed that the allowance of a net operating business loss carryover will greatly aid business and stimulate new enterprises . . . . An example will show the necessity for such a provision:

Suppose a corporation, over the 3-year period 1939–41, shows the following:

Net operating loss for 1939 ........ $2,000,000
Normal-tax net income for 1940 .... $1,000,000
Normal-tax net income for 1941 .... $1,000,000

Looking at this 3-year period, it will be seen that the corporation has not made any profit. However, assuming a flat rate of 18 percent, it would be required to pay a tax of $360,000 if there were no provision for a net loss carryover. H.Rept. No. 855, 67th Cong., 1st Sess.; 1939–2 Cum.Bull. at 510–11.

Thus, the Tax Court, in *Chartier Real Estate*, accurately characterized the purpose of the net operating loss provisions as an attempt "to ameliorate somewhat the arbitrary nature of the annual accounting period, especially in the case of businesses with great fluctuations in income from year to year." 52 T.C. at 357.

We think that the legislative history lends support to our disposition to follow the literal thrust of the language and structure of § 172. The construction we place on the statute permits corporations with stable earnings and those with fluctuating earnings and losses to receive substantially equal tax treatment. Nothing in the legislative history requires that they receive precisely

18. Act of May 10, 1934, 73 Cong., 2d Sess., Ch. 277, § 117, 48 Stat. 714.

19. Act of May 28, 1938, 75th Cong., 3d Sess., Ch. 289, § 117(c), 52 Stat. 501.

20. Act of June 29, 1939, 76th Cong., 1st Sess., Ch. 247, § 211, 53 Stat. 867.

equal tax treatment. Every dollar of loss need not have an impact on the calculation of the alternative tax which is imposed solely because it is less than the regular tax which absorbed every dollar of loss.

More importantly, if there is an anomaly in permitting a portion of a net operating loss to be offset without any actual impact on the calculation of the alternative tax, Congress has heretofore demonstrated its abilty to deal expressly with the problem. Between 1924 and 1934, Congress fashioned the alternative tax and net operating loss provisions in such a way that the full amount of net operating losses always affected the computation of the alternative tax. Such clear Congressional action in the past raises a negative inference from Congress' failure to enact similar provisions at a later date. This is particularly so where the court-fashioned remedy is more drastic than even that chosen by Congress on the prior occasion.[21] Between 1924 and 1934, if a net operating loss exceeded net ordinary income for the year in which a deduction was allowed, the excess offset capital gains for such year, which were taxed at favorable rates. The Tax Court's remedy is a ruling that such excess will be available in the future to offset ordinary income. Thus, the Tax Court has extended a greater benefit to the taxpayer than Congress did when it expressly addressed itself to this problem on a prior occasion, and we think incorrectly so.[22]

## V.

■ Since our reading of the statute and our analysis of the legislative history coincide, we hold that Taxpayer's net operating loss carryback was fully consumed in 1967 and there was no excess to apply to 1968. The contrary judgment of the Tax Court is

Reversed.

DONALD RUSSELL, Circuit Judge (dissenting):

The result reached in the majority opinion is contrary to what I regard as the clear Congressional intent in enacting the "loss carry-back" and "loss carry-forward" tax statutes. I am convinced that the correct construction of such statutes was reached in Chartier Real Estate Co. v. Commissioner, 52 T.C. 346 (1969), aff'd, per curiam 428 F.2d 474 (1 Cir. 1970); Foster Lumber Co. v. United States, 500 F.2d 1230 (8 Cir. 1974); Olympic Foundry Co. v. United States, 493 F.2d 1247 (9 Cir. 1974).

I may add that the very acquiescence of the Congress in the construction of these statutes, as set forth in *Chartier* and followed consistently in all subsequent cases prior to this decision, is a persuasive testimonial that those decisions set forth the proper construction of the statutes and that the judgment of the Tax Court should be affirmed.

21. Our dissenting brother argues that Congressional acquiescence in the construction placed on the statutes in *Chartier Real Estate* and its progeny is a strong indication that they were correctly decided. The suggestion warrants scrutiny. *Chartier Real Estate* was decided in 1969; the remaining Courts of Appeals cases were both decided in 1974. With respect to the latter, it strains the usual canons of construction to read significance into Congressional inaction, because so little time has elapsed. Even *Chartier Real Estate* would not likely have prodded a prompt Congressional response if Congress thought that the statutes were interpreted wrongly. It was a decision by a single Court of Appeals which characterized the question presented as "unimportant" and "seldom occurring." 428 F.2d at 475. Only lately has it been recognized, as represented to us in the government's oral argument, that some 99 cases involving approximately $20,000,000 in taxes have arisen. Moreover, Treasury Regulations on Income Tax (1954 Code) § 1.172–4(a)(3), directly contrary to *Chartier Real Estate*, has been in existence since, as well as before, *Chartier Real Estate*. Congressional inaction may thus be as well interpreted as Congressional approval of the regulation and Congressional treatment of *Chartier Real Estate* as a single, nonrecurring aberrant decision.

22. While the Eighth Circuit in *Foster* arrived at the same result, its opinion shows an unawareness of the character of the alternative tax between 1924 and 1934. Had this history been known, this may have been another reason why the Eighth Circuit may have reached a different result.