# UNITED STATES *v.* FOSTER LUMBER CO., INC.

No. 74–799.   Argued November 12, 1975—Reargued October 5, 1976—
Decided November 2, 1976

*Stuart A. Smith* reargued the cause for the United States. With him on the briefs were *Solicitor General Bork, Assistant Attorney General Crampton, Jonathan S. Cohen,* and *Ernest J. Brown.*

*Russell W. Baker* reargued the cause for respondent. With him on the brief was *Paul R. Lamoree.*\*

MR. JUSTICE STEWART delivered the opinion of the Court.

Section 172 of the Internal Revenue Code of 1954, as amended, provides that a "net operating loss" experienced by a corporate taxpayer in one year may be carried as a deduction to the preceding three years and the succeeding

---

\*Briefs of *amici curiae* urging affirmance were filed by *Hilbert P. Zarky* for Data Products Corp.; and by *Edward J. Schmuck, Jerome B. Libin,* and *George R. Abramowitz* for North River Insurance Co.

34

five years to offset taxable income of those years.[1] The entire loss must be carried to the earliest possible year; any of the loss that is not "absorbed" by that first year

[1] Title 26 U. S. C. § 172 (1964 ed.): "Net operating loss deduction.

"(a) *Deduction allowed.*

"There shall be allowed as a deduction for the taxable year an amount equal to the aggregate of (1) the net operating loss carryovers to such year, plus (2) the net operating loss carrybacks to such year. For purposes of this subtitle, the term 'net operating loss deduction' means the deduction allowed by this subsection.

"(b) [as amended by § 317 (b), Trade Expansion Act of 1962, Pub. L. 87–794, 76 Stat. 889, and §§ 210 (a) and 210 (b), Revenue Act of 1964, Pub. L. 88–272, 78 Stat. 47, 48] *Net operating loss carrybacks and carryovers.*

"(1) *Years to which loss may be carried.*

"(A)(i) Except as provided in clause (ii) and in subparagraph (D), a net operating loss for any taxable year ending after December 31, 1957, shall be a net operating loss carryback to each of the 3 taxable years preceding the taxable year of such loss.

"(ii) In the case of a taxpayer with respect to a taxable year ending on or after December 31, 1962, for which a certification has been issued under section 317 of the Trade Expansion Act of 1962, a net operating loss for such taxable year shall be a net operating loss carryback to each of the 5 taxable years preceding the taxable year of such loss.

"(B) Except as provided in subparagraphs (C) and (D), a net operating loss for any taxable year ending after December 31, 1955, shall be a net operating loss carryover to each of the 5 taxable years following the taxable year of such loss.

.        .        .        .

"(2) *Amount of carrybacks and carryovers.*

"Except as provided in subsections (i) and (j), the entire amount of the net operating loss for any taxable year (hereinafter in this section referred to as the 'loss year') shall be carried to the earliest of the taxable years to which (by reason of paragraph (1)) such loss may be carried. The portion of such loss which shall be carried to each of the other taxable years shall be the excess, if any, of the amount of such loss over the sum of the taxable income for each of the prior taxable years to which such loss may be carried. For purposes of the preceding sentence, the taxable income for any such prior taxable year shall be computed—

may then be carried in turn to succeeding years. The respondent, Foster Lumber Co., sustained a net operating loss of some $42,000 in 1968, which it carried back to 1966. In 1966 the respondent had had ordinary income of about $7,000 and a capital gain of about $167,000. The question presented is whether a loss carryover is "absorbed" by capital gain as well as ordinary income or is instead limited to offsetting only ordinary income. The taxpayer filed a refund suit in Federal District Court challenging the Commissioner's

"(A) with the modifications specified in subsection (d) other than paragraphs (1), (4), and (6) thereof; and

"(B) by determining the amount of the net operating loss deduction—

"(i) without regard to the net operating loss for the loss year or for any taxable year thereafter, and

"(ii) without regard to that portion, if any, of a net operating loss for a taxable year attributable to a foreign expropriation loss, if such portion may not, under paragraph (1)(D), be carried back to such prior taxable year,

"and the taxable income so computed shall not be considered to be less than zero. For purposes of this paragraph, if a portion of the net operating loss for the loss year is attributable to a foreign expropriation loss to which paragraph (1)(D) applies, such portion shall be considered to be a separate net operating loss for such year to be applied after the other portion of such net operating loss.

.          .          .          .          .

"(c) *Net operating loss defined.*

"For purposes of this section, the term 'net operating loss' means (for any taxable year ending after December 31, 1953) the excess of the deductions allowed by this chapter over the gross income. Such excess shall be computed with the modifications specified in subsection (d).

"(d) *Modifications.*

"The modifications referred to in this section are as follows:

"(1) *Net operating loss deduction.*

"No net operating loss deduction shall be allowed.

"(2) *Capital gains and losses of taxpayers other than corporations.*

"In the case of a taxpayer other than a corporation—

.          .          .          .          .

"(B) the deduction for long-term capital gains provided by section 1202 shall not be allowed."

disallowance of its claim that the $35,000 of the 1968 loss not used to offset its 1966 ordinary income survived to reduce its 1967 tax liability. The trial court and the Court of Appeals for the Eighth Circuit agreed with the taxpayer. We granted certiorari to resolve a Circuit conflict on a recurring question of statutory interpretation.[2]

I

The dispute in this case centers on the meaning of "taxable income" as used in § 172 (b)(2) to govern the amount of carrybacks and carryovers that can be successively transferred from one taxable year to another. In relevant part, § 172 (b)(2) requires the net operating loss to be carried in full to the earliest taxable year possible, and provides: "The portion of such loss which shall be carried to each of the other taxable years shall be the excess, if any, of the amount of such loss over the sum of the taxable income for each of the prior taxable years to which such loss may be carried." Thus when the loss has been carried back to the first year to which it is applicable, the loss "survives" for carryover to a succeeding taxable year only to the extent that it exceeds the taxable income of the earlier year. "Taxable income" is defined in § 63 (a) of the Code to mean "gross income, minus the deductions al-

---

[2] 420 U. S. 1003. In the present case the Court of Appeals for the Eighth Circuit followed the seminal Tax Court decision in *Chartier Real Estate Co.* v. *Commissioner,* 52 T. C. 346, aff'd *per curiam,* 428 F. 2d 474 (CA1). See 500 F. 2d 1230. The Ninth Circuit is in agreement with the First and the Eighth Circuits. See *Olympic Foundry Co.* v. *United States,* 493 F. 2d 1247, and *Data Products Corp.* v. *United States,* No. 74–3341 (Dec. 27, 1974), cert. pending, No. 74–996. The Fourth Circuit refused to follow the reasoning of those Circuits in *Mutual Assurance Soc.* v. *Commissioner,* 505 F. 2d 128. The Sixth Circuit appears to agree in principle with the Fourth Circuit's reasoning. See *Axelrod* v. *Commissioner,* 507 F. 2d 884.

lowed by this chapter." Gross income is in turn defined by § 61 (a) of the Code as "all income from whatever source derived," and specifically includes "[g]ains derived from dealings in property." On its face the concept of "taxable income" thus includes capital gains as well as ordinary income. In the absence of a specific provision excluding capital gains,[3] it thus appears that both capital gain and ordinary income must be included in the taxable income that § 172 directs must be offset by the loss deduction before any loss excess can be found to be available for transfer forward to the succeeding taxable year.

The respondent argues that the Code's prescribed method for calculating the taxes due on its taxable income conflicts with this natural reading of § 172. The Code provides two methods for computing taxes due on corporate income, and a corporation is under a statutory duty to employ the method that results in the lower tax. 26 U. S. C. § 1201 (a). Under § 11, the "regular method," ordinary income and capital gains income are added together to produce taxable income; during the period at issue a 22% tax rate was then imposed on the first $25,000 of taxable income and the remainder was taxed at a 48% rate. Section 1201 (a) of the Code prescribes the "alternative tax," calculated in two steps and applied when resulting in a lower tax liability for the corporation. The first step computes a partial tax on the taxable income reduced by the net long-term capital gain[4] at the

___

[3] Congress has specifically tailored definitions of taxable income in other sections of the Code when the § 63 (a) definition is inadequate for its purposes. See, e. g., 26 U. S. C. § 593 (b) (2) (E) (mutual savings banks); § 832 (a) (insurance companies); § 852 (b) (2) (regulated investment companies). Congress in fact did state certain modifications of the term "taxable income" in the third sentence of § 172 (b) (2), but none of these modifications suggests any instances in which taxable income does not include capital gains.

[4] For purposes of simplicity we use the term "net long-term capital gain" or simply "capital gain" rather than the statutory phrase "excess of

regular corporate rates imposed by § 11. This step effectively subjects only ordinary income to the partial tax. The second step imposes a 25% tax on the net long-term capital gain. The alternative tax is the sum of the partial tax and the tax on capital gain. In practical terms, the alternative tax does not redefine taxable income, but it does result in a much lower effective tax rate for corporations whose income is in whole or substantial part composed of capital gain. It thus extends to corporations the longstanding statutory policy of taxing income from capital gain at a lower rate than that applicable to ordinary income.

The problem from the respondent's point of view is that the mechanics of the alternative tax work in such a way that the potential benefit of the loss deduction may not be fully reflected in reduced tax liability for the taxable year to which the loss is carried. The problem arises when, as in 1966 for the respondent, the "alternative method" governs the calculation of tax liability, and the ordinary income effectively subject to the partial tax under the first step is less than the loss deduction subtracted from it. The Code does not permit the excess loss to be subtracted from the capital gain income before the second step is carried out.[5] Under the alternative method, therefore, the tax benefit of the loss deduction is effectively lost for the carryover year to the extent that it exceeds the ordinary income in that year. This can be seen simply by considering the taxpayer's circumstances in this case. Subtracting the loss deduction of $42,203.12 from the 1966 ordinary income of

net long-term capital gain over net short-term capital loss." Similarly, we sometimes in this opinion use the term "loss deduction" rather than the statutory phrase "net operating loss deduction."

[5] See 26 U. S. C. § 1201 (a) (2) and *Chartier Real Estate Co.,* 52 T. C., at 350–356; *Weil* v. *Commissioner,* 23 T. C. 424, aff'd, 229 F. 2d 593 (CA6).

$7,236.05 under Step 1 [6] resulted in a negative balance of $34,967.07; no partial tax was imposed and the 25% rate on the $166,634.81 of capital gains under Step 2 produced a tax of $41,658.70. If the loss deduction had been merely $7,236.05, and thus exactly offset the $7,236.05 of ordinary income, however, the tax due would still have been $41,658.70. The taxpayer therefore asserts that only $7,236.05 of the loss deduction was actually "used" in 1966 and that $34,-967.07 remained to be carried forward to reduce its tax liability in 1967.

There can be no doubt that if the "regular method" had been applicable to the respondent's taxes in 1966, the loss deduction ($42,203.12) would have been fully "used" to offset capital gains ($166,634.81) as well as ordinary income

---

[6] The description in the text of the alternative tax computation method is truncated; the mechanics are here set out in full:

*"Alternative Method"* (*Section 1201 (a)*)

| | | |
|---|---|---|
| Taxable Income (excluding net operating loss deduction): | | |
| Ordinary Income | $7,236.05 | |
| Capital Gain Income | 166,634.81 | |
| | | $173,870.86 |
| LESS: Net Operating Loss Deduction Resulting From Carryback of 1968 Net Operating Loss | | (42,203.12) |
| Taxable Income (Section 63 (a)) | | $131,667.74 |

(*Step 1—Partial Tax*)

| | |
|---|---|
| LESS: Excess of Net Long-Term Capital Gain Over Net Short-Term Capital Loss | $166,634.81 |
| Balance | ($ 34,967.07) |
| Partial Tax at Section 11 Rates on Balance (Section 1201 (a)(1)) | –0– |

(*Step 2—Capital Gain Tax*)

| | |
|---|---|
| PLUS: Capital Gain Tax at Flat 25 Percent Rate on Excess of Net Long-Term Capital Gain Over Net Short-Term Capital Loss (Section 1201 (a)(2)) | $ 41,658.70 |
| Alternative Tax (Sum of Partial Tax and Capital Gain Tax) (1966 rates) | $ 41,658.70 |

40

($7,236.05), leaving $131,667.74 to be taxed, and a tax bill of $58,200.52.[7] It is clear that the alternative tax produced the lower tax liability despite the inability to fully "use" the loss deduction; the lower tax resulted directly from the favorable rate of taxation of capital gain income prescribed by the alternative method. The question is whether the two "tax benefit" provisions relied on by the respondent—low capital gain taxation under the alternative method and the loss carryback provision—must each be maximized independently of the other or whether Congress instead anticipated that the benefit provided by the loss deduction might on occasion be subsumed in the greater benefit provided by the alternative tax computation method.

Section 172 does not explicitly address the question of fit between these two tax benefits, providing simply that "[t]he portion of such loss which shall be carried to each of the other taxable years shall be the excess, if any, of the amount of such loss over the sum of the taxable income for each of the prior taxable years to which such loss may be carried." The respondent contends, and the Tax Court in *Chartier Real Estate Co.* v. *Commissioner,* 52 T. C. 346, aff'd *per curiam,* 428 F. 2d 474 (CA1), held, that the phrase

---

[7] The steps taken by the Internal Revenue Service to reach that result are as follows:

*"Regular Method"* *(Section 11)*

| Taxable Income (excluding net operating loss deduction): | |
|---|---|
| Ordinary Income | $7,236.05 |
| Capital Gain Income | 166,634.81 |
| | $173,870.86 |
| LESS: Net Operating Loss Deduction Resulting From Carryback of 1968 Net Operating Loss | (42,203.12) |
| Taxable Income (Section 63 (a)) | $131,667.74 |
| Regular Tax (1966 rates) | $ 58,200.52 |

(The regular tax reflects a $1,500 tax on multiple surtax exemption not at issue in this case.)

"to which such loss may be carried" modifies "taxable income" as well as "each of the prior taxable years." The Tax Court in the *Chartier* case further held that " 'taxable income' in this context (as modified by the above phrase) means that taxable income to which the loss is actually applied in computing actual tax liability." 52 T. C., at 357–358. In other words, it was held, taxable income refers only to that ordinary income offset by a loss deduction that produces an additional reduction in tax liability under the alternative tax computation method.

It is, of course, not unusual in statutory construction to find that a defined term's meaning is substantially modified by an attached clause. But reading "taxable income to which . . . such loss may be carried" as equivalent to "taxable income to which such loss may be carried and deducted, resulting in a reduction of tax liability" gives these phrases a synergistic effect that goes well beyond their natural import. Such a construction subtly redefines "taxable income" in terms of the tax impact of a particular method of tax calculation. It thus implicitly departs from the "term of art" definition of taxable income given in § 63 (a), while discovering a significance in the word "carry" that goes well beyond its usual connotation of a transfer of a loss from the year in which it occurred. Standing alone, this strained reading of the statute's terms falls considerably short of the explicit statutory support the Court has previously required of taxpayers seeking a tax benefit from losses suffered in other years. See, *e. g., Woolford Realty Co.* v. *Rose,* 286 U. S. 319, 326.[8] If Congress had intended to allow a loss deduction to offset only ordinary income when the alternative tax calculation method is used, it could easily have said so.

---

[8] The construction urged by the respondent also finds no support in the Treasury Regulations on Income Tax that implement § 172. See 26 CFR §§ 1.172–4, 1.172–5 (1976).

## II

The respondent further asserts that the legislative history and the broad policy behind the loss deduction section of the Code support its interpretation of "taxable income" under § 172 (b). Although, for the reasons stated above, it can hardly be said that the benefit claimed by the respondent is fairly within the statutory language, it is not inappropriate to consider this contention—to consider, in short, whether "the construction sought is in harmony with the statute as an organic whole." See *Lewyt Corp.* v. *Commissioner*, 349 U. S. 237, 240.

The respondent relies on the Court's opinion in *Libson Shops, Inc.* v. *Koehler*, 353 U. S. 382, 386, for a description of the legislative purpose in allowing loss carryovers. In that case the Court said that the net operating loss carryover and carryback provisions "were enacted to ameliorate the unduly drastic consequences of taxing income strictly on an annual basis. They were designed to permit a taxpayer to set off its lean years against its lush years, and to strike something like an average taxable income computed over a period longer than one year."

There were, in fact, several policy considerations behind the decision to allow averaging of income over a number of years. Ameliorating the timing consequences of the annual accounting period makes it possible for shareholders in companies with fluctuating as opposed to stable incomes to receive more nearly equal tax treatment. Without loss offsets, a firm experiencing losses in some periods would not be able to deduct all the expenses of earning income. The consequence would be a tax on capital, borne by shareholders who would pay higher taxes on net income than owners of businesses with stable income.[9] Congress also sought

---

[9] See generally United States Treasury Department and Joint Committee on Internal Revenue Taxation, Business Loss Offsets (1947), excerpted in

through allowance of loss carryovers to stimulate enterprise and investment, particularly in new businesses or risky ventures where early losses can be carried forward to future more prosperous years.[10]

The respondent focuses on the equalizing purposes of § 172 to argue that the Commissioner's insistence on the absorption of the loss deduction by capital gain income is inconsistent with § 172's primary purpose of avoiding the subjection of similarly situated taxpayers to significantly different treatment solely on the basis of arbitrary timing. This argument is based on the observation that, unless it is accepted, the taxpayer's ability to fully benefit from the loss carryover deduction will turn on whether ordinary income in the first year to which the loss may be carried exceeds or is less than the loss deduction. If the ordinary income exceeds the loss, the taxpayer will get the full benefit of the deduction; if the ordinary income is less than the loss, the shortfall will be absorbed by capital gain income without providing an incremental tax reduction.

Congress may, of course, be lavish or miserly in remedying perceived inequities in the tax structure. While there is no doubt that Congress through the loss carryover provisions did intend to reduce the arbitrariness inherent in a taxing system based on annual accounting, the history of the loss

---

B. Bittker & L. Stone, Federal Income Estate and Gift Taxation 859–863 (1972).

[10] See, e. g., H. R. Rep. No. 855, 76th Cong., 1st Sess., 9 (1939):
"New enterprises and the capital-goods industries are especially subject to wide fluctuations in earnings. It is, therefore, believed that the allowance of a net operating business loss carry-over will greatly aid business and stimulate new enterprises."

See also H. R. Rep. No. 1337, 83d Cong., 2d Sess., 27 (1954):
"The longer period for averaging will improve the equity of the tax system as between businesses with fluctuating income and those with comparatively stable incomes, and will be particularly helpful to the riskier types of enterprises which encounter marked variations in profitability."

offset provision does not support the respondent's vision of a Congress seeking perfection in the realization of its objective.[11]

Over the years, Congress has shifted the definition of both the kinds of losses and the kinds of income that may be used in calculating the loss offset, indicating its ability in this area of the Internal Revenue Code as in others to make precise definitions and later to modify them in pursuing its broad policy goals.[12] For example, Congress in 1924 specifically provided that a noncorporate taxpayer could use the excess of a loss deduction over ordinary income to reduce the amount of capital gain subject to tax,[13] thus permitting full "use" of the loss deduction by the taxpayer. The inference can be drawn that Congress was aware of the potential "waste" of the deduction otherwise and acted to prevent it. That provision was in turn left out of the 1939 Code, leading to the contrary inference that Congress was aware of the "waste" of the deduction but decided not to remedy it.

---

[11] Since 1918, the carryover period has gradually been lengthened to provide more potential years of positive income against which experienced losses can be offset; a perfect system from a taxpayer's point of view, however, would eschew any time limitations altogether.

[12] Section 204 (b) of the Revenue Act of 1918 was the first provision to permit the excess of expenses over income in one tax year to be deducted in another tax year. A one-year carryover and carryback was allowed. See Act of Feb. 24, 1919, § 204, 40 Stat. 1060. In 1933, the National Industrial Recovery Act abolished all net operating loss carryovers and carrybacks. See Act of June 16, 1933, § 218 (a), 48 Stat. 209. In 1939, a net operating loss carryover provision was reintroduced and provided for a two-year carryover. See Act of June 29, 1939, § 122, 53 Stat. 867. The three-year carryback and five-year carryover permitted since 1958, has recently been amended to allow seven years for carryover and to permit the taxpayer to elect to forgo carrybacks and to instead carry the net operating loss forward seven years. See Tax Reform Act of 1976, § 806 (a), 90 Stat. 1598.

[13] Act of June 2, 1924, c. 234, § 208 (a) (5), 43 Stat. 262.

The 1939 revision of the Code, in fact, tolerated even further "waste" of the loss deduction, providing not only that the loss must be offset against net income (ordinary income and capital gains),[14] but that tax-exempt interest income must also be included in income that the loss was required to offset. This provision had the same arbitrary policy consequences that the respondent decries under the alternative tax computation method applicable here. It required the loss deduction to be "used up" in offsetting tax-exempt income, thus "wasting" a portion of the loss deduction's capacity to reduce overall tax liability. And it made the utility of the loss deduction turn on the accidents of timing. The loss deduction would be "wasted" in offsetting tax-exempt income realized in an early year, while if the tax-exempt income were not realized until a later year the full tax benefit of the loss deduction could have been garnered. Such results cut against any assertion that the loss-deduction provisions have consistently been used completely to minimize arbitrary timing consequences, and indicate that

---

[14] Counsel for the respondent relied in oral argument on *Merrill* v. *United States*, 122 Ct. Cl. 566, 105 F. Supp. 379, which excluded capital gain from the term "net income" in interpreting the 1939 Code's § 12 (g) limitation on tax liability, to demonstrate that "net income" under the 1939 Code could for policy reasons be construed to avoid the unnecessary "wasting" of a loss. Such a construction would be in direct conflict with the statute's general definition of "net income"; under § 122 of the 1939 Code governing loss deductions, there was no phrase like "to which such loss may be carried" to give even a colorable statutory-construction basis to its argument that net income does not include capital gain. The *Merrill* case obviously does not control construction of the "net income" term as used in § 122 of the 1939 Code. And it would be anomalous in any case to conclude that Congress meant to exclude capital gain income from offsetting a loss deduction with the purpose of avoiding "wasting" a loss deduction, when Congress simultaneously required "waste" of the loss deduction by providing that it must offset tax-exempt interest and depletion income as well as net income. See Internal Revenue Code of 1939 §§ 122 (d) (1), (2).

Congress has not hesitated in this area to limit taxpayers to the enjoyment of one tax benefit even though it could have made them eligible for two.

The 1954 Internal Revenue Code continued the 1939 Code's definition of ordinary and capital gain income as subject to set-off by the § 172 loss deduction. Although several substantive changes in the loss-deduction section were made and commented on in the legislative reports accompanying the 1954 Code,[15] there was no indication that the addition to § 172 (b) of the phrase "to which such loss may be carried" was meant to signal a willingness to condition the loss deduction's life on its ability to produce full tax benefits for the taxpayer. In view of the predecessor statutes' tolerance of a taxpayer's inability to maximize the tax benefit of a loss deduction, and the complete failure of the Committee Reports in any way to indicate the shift in policy the respondent claims to discern in the 1954 Code revision, the legislative history simply does not support the respondent's contention that the addition in 1954 of the phrase "to which such loss may be carried" was intended to eliminate the requirement that the loss deduction be used to offset capital gain under the alternative tax computation method.

We turn finally to an examination of § 172 (b) in the context of the statute as it exists today. If the statute could be viewed as consistently minimizing the arbitrariness of timing consequences, a construction of § 172 (b) inconsistent with that approach might be suspect. Section 172 as a whole has not, however, been drafted with the singleminded devotion to reducing arbitrary timing consequences that the respondent urges should control the decision in this case.

The most telling example of Congress' failure to remedy all timing accidents that "rob" a taxpayer of the full bene-

---

[15] See H. R. Rep. No. 1337, 83d Cong., 2d Sess., 27 (1954); S. Rep. No. 1622, 83d Cong., 2d Sess., 31–33 (1954); H. R. Conf. Rep. No. 2543, 83d Cong., 2d Sess., 30 (1954).

fit of the loss deduction can be found in § 172 (c). That provision defines a "net operating loss" as "the excess of the deductions allowed by this chapter over the gross income." A taxpayer does not have a loss for a particular year unless its deductions exceed its ordinary income and its capital gains. When an ordinary income loss is experienced in a year of negligible capital gains it gives rise to a net operating loss that can be carried over to other years. If that same ordinary income loss comes in a year when the net capital gains exceed that loss, there is no net operating loss under the statute to carry to another year. Because the statute also forbids setting off that ordinary loss against the capital gains before the capital gain tax is computed under the alternative method,[16] the loss' potential tax benefit is arbitrarily "lost" to the taxpayer solely as a result of accidents of timing. Congress, of course, can and occasionally has in the past treated loss years differently from carryover years. But if Congress were intent on substantially eliminating accidents of timing from the calculation of income on an average basis, it would hardly have tolerated such a departure from that purpose at the very inception of the tax benefit provided by § 172.

The respondent's argument is further undercut by the holding in *Chartier Real Estate Co.,* not challenged here,[17] that the statute forbids using a loss deduction to offset capital gain income in a loss carryover year. If such an

---

[16] See *Chartier Real Estate Co.* v. *Commissioner,* 52 T. C. 346.

[17] The *Chartier* holding relied on *Weil* v. *Commissioner,* 23 T. C. 424, a case in which the Tax Court had concluded that the express language of the 1939 Code provided for a flat rate of tax on taxable capital gain, unreduced by a loss deduction, as an alternative to the tax imposed upon such gain when it is included in gross income and taxed in the regular manner. An *amicus curiae* brief filed in the present case urges that this holding be reconsidered on policy grounds should the respondent's argument be rejected, but concedes that the language of § 1201 (a) (2) supports the result reached in *Weil* and applied in *Chartier.*

offset were permitted, the taxpayer would benefit by a further reduction in its capital gain tax liability already calculated at a preferential rate. The respondent in effect asks this Court to infer from that deliberate denial of the limited tax benefit that would accrue from using the loss to offset preferentially taxed capital gains, that Congress implicitly meant to confer the even greater tax benefit of using the loss to offset ordinary income taxed at the higher regular rates. In a statutory section that part by part manages explicitly to detail loss calculations on one hand and deductions on the other,[18] such a leap in statutory construction must be much more firmly grounded in a consistently articulated and achieved congressional purpose than can be discerned here.

The respondent's broad argument, in short, boils down to a contention that "harmony with the statute as an organic whole" can be achieved in this area only by reading the Code provision so as to give the greatest possible benefits to all taxpayers. For the reasons we have discussed, that is a contention that cannot be accepted.

The judgment is

*Reversed.*

MR. JUSTICE STEVENS, concurring.

MR. JUSTICE BLACKMUN advances persuasive policy arguments against the Court's reading of § 172. But the same

---

[18] Section 172 (d) (2) (B) provides a further indication that capital gains are properly included in the taxable income that a loss deduction must offset before being carried to a succeeding carryover year. For a noncorporate taxpayer who normally computes his tax liability by deducting 50% of net long-term capital gains under § 1202 of the Code, § 172 (d) (2) (B) requires that the full amount of ordinary income plus capital gains be offset against the net operating loss. That "taxable income" encompasses capital gain income for individual taxpayers under § 172 strongly suggests that the "taxable income" of corporate taxpayers should be given similar scope.

arguments apply equally to the Code's treatment of an operating loss which occurs in the same year as an offsetting capital gain. In paragraph 7 of his opinion MR. JUSTICE BLACKMUN seems to accept the necessity of a "wooden and unimaginative reading" of the statute in the "same year" situation though he rejects such a reading in a case involving different years. Since the statutory language seems rather plain in both situations, I think we have the same duty in both to resist the temptation to attempt any creative rewriting of the Internal Revenue Code. The relevant Code provisions were perfectly clear in 1939 and there is simply no basis for concluding that the 1954 Code was intended to achieve the result favored by MR. JUSTICE BLACKMUN, no matter how sensible such a result would be. Accordingly, as much as I would like to reach the result advocated by the dissent, I find the arguments in the Court's opinion, which I join, unanswerable.

MR. JUSTICE BLACKMUN, with whom THE CHIEF JUSTICE, MR. JUSTICE BRENNAN, and MR. JUSTICE POWELL join, dissenting.

What is at issue here is whether a corporate taxpayer's fiscal 1966 net operating loss deduction, carried back from 1968, as provided for by § 172 (a) of the Internal Revenue Code of 1954, 26 U. S. C. § 172 (a), was, to use the Government's and the Court's term, "absorbed" by the taxpayer's capital gain [1] for 1966, despite the taxpayer's inability to offset the deduction against capital gain.[2]

The Government's position is that the 1968 loss was "com-

[1] I use the term "capital gain" to mean the excess of net long-term capital gain over net short-term capital loss.

[2] See *Weil* v. *Commissioner,* 23 T. C. 424 (1954), aff'd, 229 F. 2d 593 (CA6 1956); *Chartier Real Estate Co.* v. *Commissioner,* 52 T. C. 346, 350–356 (1969), aff'd, 428 F. 2d 474 (CA1 1970).

pletely absorbed"[3] in 1966 and is unavailable for any other "carry" year (here, fiscal 1967) of the taxpayer; the Government thus would deny the taxpayer *any* tax benefit whatsoever for the excess of its 1968 loss over its 1966 net operating income.[4] The Court today agrees. Because I feel the Court's conclusion is at odds with obvious congressional policies, defeats the purposes of both the capital gain and the "carry" provisions, and is the product of a wooden and unimaginative reading of the pertinent Code sections, I dissent. Congress, accordingly, if its policies are to be effectuated, must try once again.

1. There are two separate policies at work here. Each favors the taxpayer; neither favors the Government. The first is the policy behind Congress' separating capital gain from ordinary income and providing the alternative method of tax computation by § 1201 of the Code, 26 U. S. C. § 1201. By placing a ceiling on the tax rate for capital gain, Congress encourages both the investment and the formation of capital that has proved so essential for the Nation's economic development and strength. Chief Judge Mehaffy, in his opinion for the Court of Appeals in the present case, put it this way:

> "The purpose behind the alternative tax in section 1201 is to alter the tax rate to reflect the traditionally unique character of income arising out of the sale of capital assets." 500 F. 2d 1230, 1232 (CA8 1974).

The second policy is that behind the carryback and carryover provisions: to afford the taxpayer relief from the peaks and valleys occasioned by our system of reporting and paying income taxes annually, and to encourage venture capital.

> "Those provisions were enacted to ameliorate the unduly drastic consequences of taxing income strictly on an

---

[3] Tr. of Oral Rearg. 8.

[4] The parties agree that the carryback served to erase the taxpayer's small net operating income for fiscal 1966.

annual basis. They were designed to permit a taxpayer to set off its lean years against its lush years, and to strike something like an average taxable income computed over a period longer than one year." *Libson Shops, Inc.* v. *Koehler*, 353 U. S. 382, 386 (1957).[5]

See also *Bulova Watch Co.* v. *United States*, 365 U. S. 753, 759 (1961); S. Rep. No. 665, 72d Cong., 1st Sess., 11 (1932); H. R. Rep. No. 855, 76th Cong., 1st Sess., 9 (1939); H. R. Rep. No. 2319, 81st Cong., 2d Sess., 59 (1950).

The Government's—and the Court's—position, however, sets these policies at cross purposes. The alternative method, required under § 1201 when capital gain is sufficient to make it beneficial for the current year, may become a fatal trap if net operating loss happens to be sustained in a subsequent year. This is so because the Government, as it has here, then confronts the taxpayer with the proposition that the carryback loss excess has been "absorbed" even though *no* ordinary income, or income of any kind, has in fact absorbed it. Use of the alternative method thus has the wholly unintended—and undesirable—result of undercutting the ameliorative purpose of the "carry" provisions, and they become meaningless in specific application. What supposedly was given by each provision is now, and to a largely unpredictable extent, taken away. I regret this disregard for avowed congressional policies and for the statutory provisions that effectuated those policies.

2. There is a mathematical and tax illogic and unfairness in the Government's—and the Court's—analysis. Assuming,

---

[5] The Court of Appeals, in the present case, also aptly described this policy:

"The basic purpose behind the net operating loss carry back provisions of section 172 is to ameliorate the harsh tax consequences that can result from the necessity of accounting for certain exceptional economic events within the confines of an arbitrary annual accounting period." 500 F. 2d, at 1232.

as we must, that inequality is not unknown in income taxation, that an adverse event of year A does not ordinarily soften the tax impact upon a prior or subsequent and more prosperous year B, that this is a consequence of the fact that income and the taxes thereon are computed on an annual basis, see *Burnet* v. *Sanford & Brooks Co.,* 282 U. S. 359, 363 (1931); *Woolford Realty Co.* v. *Rose,* 286 U. S. 319, 326 (1932), and that " 'general equitable considerations' do not control the question of what deductions are permissible," *United States* v. *Olympic Radio & Television,* 349 U. S. 232, 236 (1955); *Lewyt Corp.* v. *Commissioner,* 349 U. S. 237, 240 (1955), the fact remains that the carryback and carryover provisions, as noted above, were *designed* to provide a leveling influence on the peaks and valleys and to have the taxpayer's burden be one that is more realistic and in tune with actual economic gain. Thus, "where the benefit claimed by the taxpayer is fairly within the statutory language and the construction sought is in harmony with the statute as an organic whole, the benefits will not be withheld from the taxpayer." *Ibid.* This is accomplished, it seems to me, by deeming a net operating loss as "carried" to taxable income only to the extent there is an actual setoff. Despite the Court's intimation to the contrary, *ante,* at 43–44, this effectuates only fairness, not perfection. No one expects perfection in income taxation.

3. As the Government applies its theory to this taxpayer, the results are startling. Had the capital gain of fiscal 1966 been realized in its entirety in fiscal 1967, the taxpayer's net operating loss excess (remaining after washing out the small net operating income of fiscal 1966) would be applied in its entirety against the larger net operating income of 1967. The result is that the taxpayer's total income taxed for 1966–1968 would then be its actual net economic gain for that period. The same would be true if the taxpayer's fiscal 1967 net operating income had been realized in fiscal

1966. But under the Government's—and the Court's—analysis, solely because the taxpayer realized capital gain in fiscal 1966, the net operating loss of 1968 is said to be totally "absorbed" in 1966 even though the "absorption" is imaginary and little less than mystical.

The Government's "absorption" serves to make the "income" taxed for the aggregate period exceed the taxpayer's actual economic gain by the amount of the so-called "absorption." The result thus depends on happenstance, that is, on whether the capital gain comes earlier or later. This totally defeats the ameliorative purpose of the carryback and carryover legislation and, it seems to me, is punitive in application.[6] On this approach, the taxpayer, to the extent business exigencies permit, is forced to time capital gain in accord with its estimate of unknown and unforeseeable net operating income or loss in future tax years. And it is hardly an answer to claim, as the Government does, that the "absorption" of the excess in fiscal 1966 really did

---

[6] Judge Raum, in my view, stated it correctly:

"The computation under the 'regular' method was merely tentative, to determine whether the 'regular' method would produce a smaller tax. Since it did not produce a smaller tax, it was in effect not employed at all as a measure of petitioner's 1962 tax, and under the actual computation used (the 'alternative' method) only $1,115.57 of the net operating loss was absorbed, leaving the remaining $10,342.64 to be carried forward to 1965. This result is required by a proper interpretation of the provisions dealing with carrybacks and carryovers.

.        .        .        .        .

"We think it is to exalt form over substance to contend that, since a 'regular' computation was made in order to determine whether the amount of tax resulting therefrom was greater than that produced by the 'alternative' method of computation, and since the net operating loss was deducted in full in the 'regular' method, the entire loss was therefore taken into account in the tax computation, even though the 'alternative' method, to which only $1,115.57 was applied, ultimately produced petitioner's actual tax liability." *Chartier Real Estate Co.* v. *Commissioner,* 52 T. C., at 357, 358.

not serve to increase the amount taxed for the aggregate period. No taxpayer, struggling with the realities of the business and tax worlds, will ever be convinced that the allowance of a deduction by words when coupled with its disallowance by administrative fiat, does not result in the taxpayer's being taxed on more economic gain than it has realized. In contrast, the application of consistent prior judicial decisions, see paragraph 4, *infra,* would better accord with economic reality, and would treat corporate taxpayers with stable income and those with fluctuating income over the "carry" period more nearly the same.

4. Decisions in favor of the taxpayer's position provided an unbroken line of authority in the Tax Court,[7] in the District Courts,[8] and in the Courts of Appeals,[9] until the Fourth Circuit, under the Government's persistence and by a divided vote, concluded otherwise.[10] *Mutual Assurance*

---

[7] *Chartier Real Estate Co.* v. *Commissioner,* 52 T. C., at 356–358 (Judge Raum) ; *Mutual Assurance Soc.* v. *Commissioner,* 32 TCM 839, ¶ 73,177 P–H Memo TC (1973) (Judge Quealy) ; *Axelrod* v. *Commissioner,* 32 TCM 885, ¶ 73,190 P–H Memo TC (1973) (Judge Featherston) ; *Continental Equities, Inc.* v. *Commissioner,* 33 TCM 812, ¶ 74,189 P–H Memo TC (1974) (Judge Tannenwald). See *Lone Manor Farms, Inc.* v. *Commissioner,* 61 T. C. 436 (1974), aff'd, 510 F. 2d 970 (CA3 1975).

[8] *Olympic Foundry Co.* v. *United States,* 72–1 USTC ¶ 9299 (WD Wash. 1972) ; *Naegele* v. *United States,* 73–2 USTC ¶ 9696 (Minn. 1973), appeal docketed, No. 73–1921 (CA8) ; *Data Products Corp.* v. *United States,* 74–2 USTC ¶ 9759 (CD Cal. 1974).

[9] *Chartier Real Estate Co.* v. *Commissioner,* 428 F. 2d 474 (CA1 1970) ; *Olympic Foundry Co.* v. *United States,* 493 F. 2d 1247 (CA9 1974) ; *Foster Lumber Co.* v. *United States,* 500 F. 2d 1230 (CA 1974) (case below) ; *Data Products Corp.* v. *United States,* No. 74–3341 (CA9, Dec. 27, 1974), cert. pending, No. 74–996.

[10] Scholarly commentary, however, has not been uniform. See Hawkins, Mechanics of Carrying Losses to Other Years, 14 W. Res. L. Rev. 241, 250–251 (1963), and D. Herwitz, Business Planning 844 (1966), both pre-*Chartier.* Compare Note, 8 San Diego L. Rev. 442 (1971), Note, 55 B. U. L. Rev. 134 (1975), and May, Net Operating Losses and Capital Gains—a Deceptive Combination, 29 Tax Lawyer 121 (1975), with

*Soc.* v. *Commissioner,* 505 F. 2d 128 (1974).[11] Where, as here, we are concerned with technical and what the Government calls "the highly detailed provisions of Section 172," Brief for United States 6, the Tax Court's expertise is at its most valuable level and should be sought out and accorded deference. See the comment of Mr. Justice Jackson, dissenting, in *Arrowsmith* v. *Commissioner,* 344 U. S. 6, 12 (1952), concerning the Tax Court's competence and "steady influence" in "a field beset with invisible boomerangs."[12] But the Court accords no deference to the Tax Court's consistent position on the technical problem before us.

The reasoning in *Chartier Real Estate Co.* v. *Commissioner,* 52 T. C. 346 (1969), aff'd, 428 F. 2d 474 (CA1 1970), and the several cases that followed it, accommodates the respective congressional purposes behind the capital gain and the "carry" provisions. In *Chartier* the Government's dual position—seeking to prevent the application of the loss carryback to the earlier year's capital gain, and also claiming that the carryback nevertheless was absorbed by the capital gain—sought the best of two worlds. Its first proposition

---

Branda, Net Operating Losses and Capital Gains—Some Bizarre Consequences of the Alternative Tax Computation, 28 Tax Lawyer 455 (1975). In the last article the author concludes:

"*Chartier* and its progeny . . . despite strained reliance on the language of section 172(b)(2) . . . are more soundly based on the policy underlying the favorable treatment of capital gains. . . .

"The reversals of the Tax Court by the Fourth and Sixth Circuits . . . are unconvincing." *Id.,* at 470.

See also Pratt & Scolnick, The Net Operating Loss Deduction: Disagreement Among Circuit Courts Creates Confusion, 53 Taxes 274 (1975); Nagel, Planning to Avoid Wastage of NOL Carryovers: A Lesson from Chartier Realty, 42 J. Taxation 26 (1975).

[11] Subsequently, the Sixth Circuit, in a case concerning individual taxpayers, agreed with the Fourth Circuit. *Axelrod* v. *Commissioner,* 507 F. 2d 884 (1974).

[12] See also Remarks of Mr. Justice Stewart at the Dedication of the New Courthouse of the United States Tax Court, 28 Tax Lawyer 451, 453 (1975).

was upheld. Its second proposition was rejected, and properly so, because the acceptance of the former precluded acceptance of the latter if congressional policy were to be recognized.

No effort was made in Congress to change the statutes in order to overcome the judicial interpretation that was uniform until 1974. That, for me, as Judge Russell pertinently observed in dissent in *Mutual Assurance*, 505 F. 2d, at 138, "is a persuasive testimonial that those decisions set forth the proper construction of the statutes." And the Government acknowledged at oral argument that the Internal Revenue Service sought no clarifying legislation in the Congress. Tr. of Oral Rearg. 18–20.

5. The legislative history reflects a proper concern for achieving a tax structure that operates fairly on income that fluctuates. Amelioration provisions are not new and, in fact, appeared in the income tax law as early as the Revenue Act of 1918. § 204 (b) of that Act, 40 Stat. 1061. Since 1939 the periods for carrybacks and carryovers have been expanded [13] from the two-year carryover of 1939 until, in 1958 and lasting until 1976, a structure of a three-year carryback and a five-year carryover was erected.[14] It was said later that for "most companies" this period "is long enough to absorb all of their losses against income." S. Rep. No. 1881, 87th Cong., 2d Sess., 129 (1962).

6. The Court today accepts the Government's contention

---

[13] Revenue Act of 1939, § 211 (b) (adding § 122 to the Internal Revenue Code of 1939), 53 Stat. 867; Revenue Act of 1942, § 153 (a), 56 Stat. 847; Revenue Act of 1950, § 215 (a), 64 Stat. 937; Internal Revenue Code of 1954, § 172 (b), 68A Stat. 63; Technical Amendments Act of 1958, § 203 (a), 72 Stat. 1678.

[14] The Tax Reform Act of 1976, § 806 (a), 90 Stat. 1598, adds to § 172 (b) (1) (B) of the Code, as amended, a sentence providing that for any taxable year ending after December 31, 1975, a net operating loss may be carried over for seven years following the loss. This thus increases the carryover period from five to seven years.

that the meaning of the critical § 172 (b)(2) [15] is clearly and unambiguously against the taxpayer. It is said that the phrase "to which such loss may be carried" obviously modifies "each of the prior taxable years," rather than "taxable income." [16] That the language of the statute is *not* clearly in favor of the Government is demonstrated, if by no other means, by the existing conflict among the Circuits and by the decisions of the Districts Courts and of the Tax Court, cited above in nn. 7, 8, and 9, that have run so uniformly against the Government. If the language were as clear and unambiguous in the Government's favor as is contended, it hardly could have been read otherwise by so many capable and experienced judges. And the clear meaning which the Court now perceives does not, and cannot,

---

[15] Until the Tax Reform Act of 1976, § 172 (b)(2) read:

"Except as provided in subsections (i) and (j) [not pertinent here], the entire amount of the net operating loss for any taxable year (hereinafter in this section referred to as the 'loss year') shall be carried to the earliest of the taxable years to which (by reason of paragraph (1)) such loss may be carried. The portion of such loss which shall be carried to each of the other taxable years shall be the excess, if any, of the amount of such loss over the sum of the taxable income for each of the prior taxable years to which such loss may be carried. . . ."

Section 1901 (a)(29)(C)(iv) of the 1976 Act, 90 Stat. 1769, replaced the phrase "subsections (i) and (j)" with "subsection (g)."

The words "to which such loss may be carried" first appeared in the 1954 Code. 68A Stat. 63. Apparently there is no committee or other legislative commentary on the addition of these words to § 172 (b)(2).

[16] The Government's—and now the Court's—argument that the phrase "to which such loss may be carried" must modify "each of the prior taxable years," and is confined in its modification to that phrase, is surely wrong as a matter of routine statutory construction. This is so because that analysis renders the modifying phrase useless and redundant. The preceding §§ 172 (a) and (b)(1) already have directed that the loss be carried, and in the prescribed order, to specified taxable years. There is no additional need for § 172 (b)(2) to recite a limitation of the years to which the loss may be carried.

comport with the underlying purpose of the carryback and carryover provisions.

7. The definition of § 172 (c),[17] to the effect that a taxable year does not result in a net operating loss when capital gain of that year exceeds any deficit in ordinary income, does not defeat the taxpayer. Congress was definite and specific in its definition of "net operating loss" for "carry" purposes in a tax year of that kind. But we are not concerned here with such a year and such a definition. We are concerned, instead, with 1968 where this taxpayer had a "net operating loss" and no capital gain or loss. That net operating loss is established and *is* available for "carry." The definitional restriction of § 172 (c) obviously has no application to 1968 for this taxpayer.

Nor is § 172 (d)(2)(B) contrary to the taxpayer's position. Section 172 (d)(2) is restricted in its application to "a taxpayer other than a corporation." Corporate and individual taxpayers frequently are treated differently in our income tax structure, and I find little of assistance, even by way of inference, in § 172 (d)(2)(B) for resolving the issue before us in connection with a corporate taxpayer.

8. "Taxation is a practical matter." *Harrison* v. *Schaffner,* 312 U. S. 579, 582 (1941). To do what the Court does today is to ignore that wise precept. What the Government urges— and the Court does—promotes inequality of treatment between taxpayers experiencing like economic gains over the "carry" period, whenever a capital gain happens to be present in one taxpayer's taxable year but happens to be absent in

---

[17] Until the Tax Reform Act of 1976, § 172 (c) read:

"For purposes of this section, the term 'net operating loss' means (for any taxable year ending after December 31, 1953) the excess of the deductions allowed by this chapter over the gross income. Such excess shall be computed with the modifications specified in subsection (d)."

The parenthetical expression was eliminated by § 1901 (a)(29)(B) of the 1976 Act, 90 Stat. 1769.

the same year for another taxpayer. A provision intended to equalize to a great extent the tax burdens as between corporations with fluctuating income and those with stable income should not be used to render that goal unattainable or to introduce irrationalities.

I would affirm the judgment of the Court of Appeals.