BERCY INDUSTRIES, INC., and subsidiaries, Petitioners-Appellants,

v.

COMMISSIONER OF INTERNAL REVENUE, Respondent-Appellee.

No. 78–3104.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted Sept. 15, 1980.

Decided March 30, 1981.

Don M. Pearson, Argue, Freston & Myers, Los Angeles, Cal., argued for petitioners-appellants; Robert P. Beckham, Los Angeles, Cal., on brief.

R. Bruce Johnson, Washington, D. C., argued for respondent-appellee; Jonathan S. Cohen, Washington, D. C., on brief.

Before TRASK and NELSON, Circuit Judges, and SOLOMON,[*] District Judge.

TRASK, Circuit Judge:

Appellant Bercy Industries, Inc. (Bercy), appeals from a decision of the Tax Court[1] affirming a deficiency assessment by the Commissioner of Internal Revenue (the Commissioner). This court has jurisdiction pursuant to I.R.C. [26 U.S.C.] § 7482. Bercy contends that the Commissioner improperly denied it a loss carryback under section 381 of the Internal Revenue Code (the Code). Subsection (b)(3) of that section limits post-reorganization loss carry-backs by the surviving corporation of certain tax-free reorganizations. Surviving corporations in other tax-free reorganizations, however, are permitted carryback of post reorganization losses without special limitation. Bercy argues that either Congress intended that corporations that reorganize as Bercy did be permitted to carryback their post-reorganization losses, or Bercy's reorganization qualifies as one of the types entitled to unrestricted carryback treatment. The Commissioner responds that the Code should be strictly construed and that Bercy

does not qualify for unrestricted carryback treatment under the terms of section 381. We reverse.

## I

Bercy Industries was incorporated in 1965. In 1968, a corporation named Beverly Enterprises established a subsidiary shell corporation, Beverly Manor. Beverly Manor remained a shell until April 23, 1970, the date of the reorganization here at issue. On that date, Bercy Industries (Old Bercy) was acquired by Beverly Manor by means of a triangular merger.[2] Old Bercy was merged into Beverly Manor, which then changed its name to Bercy Industries (New Bercy). All shareholders of Old Bercy exchanged their stock for shares of stock in Beverly Enterprises, the parent. The Old Bercy stock was then cancelled.

Although it had been anticipated that New Bercy would be as profitable as Old Bercy had been, New Bercy suffered a loss for the post-reorganization period April 23 to December 31, 1970. Relying on the carryover provisions of section 172 of the Code, New Bercy attempted to carry back this loss to offset net operating income of Old Bercy in its two preceding tax years. It is this carryback that the Commissioner disallowed, and that is the subject of this appeal.

Appellant raises two issues: (1) whether Congress, in enacting section 381, intended to prevent the subsidiary corporation in a triangular merger from carrying back post-merger losses to offset pre-merger income of the transferor corporation, where the subsidiary was a mere shell before the merger, and (2) whether the reorganization here at issue should be classified as a type (B) reorganization for purposes of section 381. Both issues are of first impression in this circuit. We address only the first issue.

---

[*] Honorable Gus J. Solomon, Senior United States District Judge for the District of Oregon, sitting by designation.

[1] 70 T.C. 29 (1978).

[2] This is a transaction in which a subsidiary corporation acquires another corporation by using the stock of the subsidiary's parent as consideration for the acquisition.

## II

■ Under I.R.C. § 172, a corporation which incurs a net operating loss in any tax year may carry this loss back three tax years, or forward seven tax years, to offset net operating income earned during those years. Section 172 reflects congressional recognition that business income often fluctuates widely from year to year, and that, consequently, a carryover provision is necessary to mitigate the inequitable and excessive tax liabilities that would result from determination of income on a strictly annual basis. *United States v. Foster Lumber Co.*, 429 U.S. 32, 42–44, 97 S.Ct. 204, 210, 50 L.Ed.2d 199 (1976); *Libson Shops, Inc. v. Koehler*, 353 U.S. 382, 386, 77 S.Ct. 990, 992, 1 L.Ed.2d 924 (1957); *Aetna Casualty and Surety Co. v. United States*, 568 F.2d 811, 819 (2d Cir. 1976).

In 1954, Congress enacted section 381 as part of a substantial revision of the entire Code. The Commissioner argues that Congress intended this provision to preempt and replace prior caselaw with reliable and consistent rules for carrying over pre- and post-reorganization income and loss. Conceding this to be the general purpose of section 381, appellant nevertheless argues that it is an oversimplified characterization of congressional intent with respect to subsection (b)(3). We agree.

Prior to the 1954 revision of the Code, a significant tax avoidance problem for the Internal Revenue Service was the corporate practice of "trafficking in loss corporations."[3] The Commissioner had attempted to combat this practice by ruling that net operating losses could be carried over only to offset income of the particular legal entity that incurred the losses. *See, e. g., Libson Shops, Inc. v. Koehler, supra*, 353 U.S. at 385–86, 77 S.Ct. at 992 (decided under the 1939 Code). Thus, the acquiring corporation in a triangular merger was effective-

ly prevented from carrying back any post-merger losses to offset pre-merger income of the transferor corporation.

Although approved by the Supreme Court in *New Colonial Ice Co. v. Helvering*, 292 U.S. 435, 440–41, 54 S.Ct. 788, 790, 78 L.Ed. 1348 (1934), the Commissioner's position was undercut by a succession of adverse court decisions, *see, e. g., Helvering v. Metropolitan Edison Co.*, 306 U.S. 522, 529, 59 S.Ct. 634, 638, 83 L.Ed. 957 (1939); *Stanton Brewery v. Commissioner*, 176 F.2d 573, 575 (2d Cir. 1949), which resulted in substantial confusion among corporations as to when post-reorganization loss carryovers were permitted, *see* H.R.Rep. No. 1337, 83d Cong., 2d Sess. 41, *reprinted in* [1954] U.S. Code Cong. & Ad.News 4017, 4066–67; S.Rep.No. 1622, 83d Cong., 2d Sess. 52–53, *reprinted in* [1954] U.S.Code Cong. & Ad. News 4621, 4683–84. Section 381 and its companion, section 382, rejected the restrictive position taken by the Commissioner and clarified the availability of post-reorganization loss carryovers by prohibiting them only in limited circumstances specified in the two sections. *United States v. Adkins-Phelps, Inc.*, 400 F.2d 737, 742–43 (8th Cir. 1968) (quoting *Maxwell Hardware Co. v. Commissioner*, 343 F.2d 713, 718–19 (9th Cir. 1965)); *see* B. Bittker & J. Eustice, Federal Income Taxation of Corporate Income and Shareholders, para. 16.10, at 16–16 to –17 (4th ed. 1979); S.Rep. No. 1622, *supra*, at 52, *reprinted in* [1954] U.S.Code Cong. & Ad.News 4683; Note, *Section 368(a)(1)(F) and Loss Carrybacks in Corporate Reorganizations*, 117 U.Pa.L.Rev. 764, 765 (1969).

With respect to the enactment of subsection (b)(3) of section 381, the legislative history shows that Congress was concerned with a complex accounting problem—deciding how a post-reorganization loss should be allocated between the acquiring corporation

---

**3.** A profitable corporation would acquire an unprofitable corporation with losses eligible to be carried forward under section 172. After the acquisition, the transferor corporation's pre-reorganization losses were carried forward to offset current and expected income of the acquiring corporation, thereby reducing current

tax liability. *See generally* D. Kahn & P. Gann, Corporate Taxation and the Taxation of Partnerships 848–49 (1979); Note, *Section 368(a)(1)(F) and Loss Carrybacks in Corporate Reorganizations*, 117 U.Pa.L.Rev. 764, 765 (1969).

and the transferor corporations, and, therefore, how much of the loss should be carried back to offset each entity's income in the preceding three tax years. Senate Finance Committee, *Hearings on H.R. 8300,* 83d Cong., 2d Sess. 404 (1954). *See also* Asinow, *Detriment and Benefit of Net Operating Losses: A Unifying Theory,* 24 Tax L.Rev. 1, 24 (1966). The Senate Finance Committee reported: "Some limitation upon carry-backs in reorganizations and mergers is justifiable on the ground that it is too complex in some cases to determine to which of several component corporations the loss of the surviving corporation is attributable." Senate Finance Committee, *supra,* at 404. This committee also stated, however, that

> ▉n two important areas . . . *the problem of allocating the loss is not involved,* and it is suggested that *in such cases, at least, there should be no limit on carrybacks.* One is the case of a reincorporation of the same corporation in a different state, or upon expiration of its charter. Another instance is that of the wholly owned subsidiary which is liquidated into its parent, which parent suffers a net operating loss in the following year.

*Id.* (emphasis added). This language strongly suggests that when a reorganization generates no complex problems of post-reorganization loss allocation, Congress intended that the surviving corporate taxpayer be able to carry back such losses without limitation.

▉ Because Congress specifically identified two circumstances in which loss carrybacks should be permitted, the Commissioner argues that if Congress had also intended to permit carrybacks in a triangular merger involving a shell corporation, it would have specifically mentioned this circumstance as well. In 1954, however, the Code did not permit a corporation to use its parent's stock as consideration for the acquisition of another corporation's assets in a tax-free reorganization. This prevented the use of shells in effecting such reorganizations. Congress did not suggest that this type of tax-free reorganization be removed from the carryback restrictions of section 381(b)(3) because such a reorganization was not then tax-free. Such use of parent stock was sanctioned by amendments to the Code in 1968 and 1971. Act of Oct. 22, 1968, Pub.L.No. 90–621, § 1(a), 82 Stat. 1310–11 (triangular mergers); Act of Jan. 12, 1970, Pub.L.No. 91–693, § 1(a), 84 Stat. 2077 (reverse triangular mergers). We find nothing in the text or legislative history of these amendments that would suggest that they were intended to expand the scope of section 381(b)(3) beyond the problem to which it was originally directed, *i. e.,* allocation of post-reorganization loss. *See generally* H.Rep.No. 1653, 90th Cong., 2d Sess., *reprinted in* [1968] U.S.Code Cong. & Ad. News. 4440–43; S.Rep.No. 91–1533, 91st Cong., 2d Sess., *reprinted in* [1970] U.S.Code Cong. & Ad.News 6123–25.

The non-applicability of subsection (b)(3) to type (B), (E), and (F) reorganizations[4] supports our view of congressional intent with respect to this subsection. (B) reorganizations involve exchange of stock at the shareholder level only, (E) reorganizations are a recapitalization of a single corporation, and (F) reorganizations are a mere change in form or identity. A loss carryback after one of these reorganizations generally does not result in the offset of income earned by one corporation by losses incurred by another.[5] Thus, there are no post-reorganization allocation problems.

▉ Both legislative history and statutory structure support the conclusion that Congress was preoccupied with post-reorga-

---

**4.** (F) reorganizations are explicitly exempted by the terms of the statute. *See* I.R.C. § 381(b). (B) and (E) reorganizations are exempted because they are not described in subsection (a)(2), to which subsection (b)(3) refers. *See* Treas.Reg. 1.381(a)–1(b)(3)(i) (T.D.6500).

**5.** Such a result occurs in some (F) reorganizations. Such a reorganization, however, nearly always involves the consolidation of wholly owned subsidiaries into a parent corporation, so that the loss allocation problems are far less significant than would normally be the case. *See e. g., Estate of Stauffer v. Commissioner,* 403 F.2d 611 (9th Cir. 1968). *See also* B. Bittker & J. Eustice, *supra,* para. 16.12, at 16–22 to –23 & nn. 40–41.

nization allocation problems when it enacted the loss carryback restriction. We agree with the Second Circuit that the intent of Congress with respect to subsection (b)(3) of section 381 was to prohibit carryback of post-reorganization losses pursuant to section 172 only when such a carryback would entail complex problems of post-reorganization loss allocation. *See Aetna Casualty & Surety Co. v. United States, supra,* 568 F.2d at 819, 822, 824.

## III

The Commissioner states that section 381(b)(3) reflects a policy of not permitting loss carrybacks when the legal and economic identity of the corporation has been substantially altered.[6] The Commissioner argues that Old Bercy was legally transformed by its merger into New Bercy and the subsequent cancellation of its stock. He further argues that the reorganization transformed Old Bercy economically by shifting control of that corporation from its own shareholders to those of Beverly Enterprises.

■ Even assuming that the Commissioner has correctly articulated the congressional policy underlying subsection (b)(3), we are not persuaded that a material change in identity resulted from the reorganization here at issue. The reorganization involved only one set of operating assets, one set of books, and one tax history. New Bercy is operating the same commercial business that Old Bercy operated. There is no problem of allocating a post-reorganization loss to different pre-reorganization businesses. Regardless of the formal technicalities of the transaction, the indisputable fact is that the same business generated both the income and the loss.[7] The legislative history of section 381 shows that Congress intended that a loss carryback be available in circumstances such as these.

## IV

■ It has long been judicial practice in reviewing tax cases to look through the form of a transaction to its substance when scrutiny of form alone would subvert the purposes of the Code. *See, e. g., Gregory v. Helvering,* 293 U.S. 465, 469–70, 55 S.Ct. 266, 267, 79 L.Ed. 596 (1935). We have discovered no tax policy, nor does the Commissioner articulate one, that would be promoted by denying a loss carryback in this instance.[8] On the contrary, section 172 manifests a congressional policy preference for loss carryovers which is not to be lightly set aside. *Aetna Casualty & Surety Co. v. United States, supra,* 568 F.2d at 822, 824.

---

6. In the Commissioner's view, subsection (b)(3) does not apply to type (B), (E), and (F) reorganizations only because such reorganizations leave the surviving corporation's pre-reorganization legal and economic identity essentially unchanged.

7. The Commissioner makes much of the fact that because of the reorganization, the benefit of the loss carryback will accrue to a different set of shareholders than the one that owned Bercy at the time it earned the income to be offset. We fail to see why this should prevent a carryback. Sections 381 and 382 are grounded on two competing theories: (1) A loss carryover ought to be available only when the shareholders who were the "beneficial sufferers" of such loss retain an interest in its use, as the Commissioner argues; and (2) a loss carryover ought to be available only for use against profits from business activities which gave rise to the loss. Kaufman, *Application of a Loss Carryover of One Business Against Profits From Another Business;* Lisbon Shops *and Sections 381, 382, and 269,* 24 N.Y.U.Inst.Fed. Tax. 1199, 1203 (1966). These two theories

conflict in large degree, so that any particular subsection of 381 or 382 may favor one theory over the other. *See id.* As our discussion of congressional intent indicates, see Part II *supra,* this was the case with section 381(b)(3); theory (2), rather than theory (1), clearly animates subsection (b)(3). Moreover, we note that the former shareholders of Old Bercy are now minority holders of Beverly Enterprises, and have a continuing, albeit diminished, interest in carryback of the post-reorganization loss. Finally, the Commissioner himself concedes that a loss carryback would have been permitted had Bercy reorganized pursuant to a reverse triangular merger, yet such a reorganization would have resulted in the same change in shareholder ownership which the Commissioner now argues should prevent the carryback.

8. We are unpersuaded by the Commissioner's argument that chaos and inconsistency will result from permitting loss carrybacks in circumstances such as those in this case.

To deny a loss carryback on the facts of this case would exalt form over substance. Accordingly, we hold that subsection (b)(3) of section 381 does not prevent Bercy from using the loss carryback provisions of section 172.[9] The judgment of the Tax Court is REVERSED.

---

**9.** In so doing, we express no opinion as to whether a triangular merger in which the transferor corporation is merged into a shell subsidiary may be a type (B) reorganization for purposes of section 381. *But cf. Aetna Cas. & Sur. Co. v. United States*, 568 F.2d at 524 ("it makes no difference whether effectuating Congressional intent ... is achieved by construing § 368(a)(1)(F) somewhat broadly ... or by construing § 381(b)(3) somewhat narrowly").

